UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------------------x

SEMTEK INTERNATIONAL INCORPORATED,

                              Plaintiff,                    Civil Action No.:
                                                     1:09-cv-10183-RWZ

      - against –

INFORMATION SATELLITE SYSTEMS /AKA/
"ACADEMICIAN M.F. RESHETNEV INFORMATION      **[Leave to File Excess**
SATELLITE SYSTEMS" /AKA/ "ISS-RESHETNEV        **Pages GRANTED 8/25/10]**
COMPANY," /AKA/ "ACADEMICIAN M.F.
RESHETNEV NAUCHNO-PROIZVODSTVENNOE
OBIEDINENIE PRIKLADNOI MEKHANIKI"
/AKA/ "NPO PM,"

                                  Defendant.

-----------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

        Plaintiff Semtek International Incorporated ("Semtek") respectfully submits this Memorandum of Law pursuant to Fed. R. Civ. P. 55 and 28 U.S.C. § 1608 (e) and in support of its Motion for Default Judgment against defendant Information Satellite Systems, (hereinafter "ISS"), a/k/a Academician M.F. Reshetnev Nauchno-Proizvodstvennoe Obiedinenie Prikladnoi Mekhaniki" a/k/a NPO PM (hereinafter "NPO PM"), for failure to plead or otherwise defend.

## INTRODUCTION

        The instant action is supplementary to and in aid of collection of a judgment for money and injunctive relief that this Court entered on April 12, 2000 in Case No. 95-CV-11820 (RCL), against Merkuriy LTD ("Merkuriy") and its Executive Director, Pyotr Sivirin ("Sivirin"), in favor of Semtek in the sum of $381,396,000.00, plus interest and costs. *See* April 12, 2000 Judgment, attached to the Affidavit of John Fawcett, Ex. 1 (hereinafter "Fawcett Aff., Ex. ___").

The original 1995 lawsuit which produced the judgment arose from Merkuriy's breach of an agreement which gave Semtek the right to market NPO PM satellites for commercial purposes.

It took five years of litigation to obtain the April 12, 2000 default judgment. During that time, the Court found Merkuriy and Sivirin in default twice for failing to appear. However, based upon defendants' representations that they would appear, the Court twice vacated the defaults and allowed them to file a late answer. Despite having been granted this relief by the Court, the Russian defendants ignored court ordered discovery and failed to appear at a court ordered conference, resulting in entry of the third and final default judgment.  To date, defendants have failed to pay the judgment.[1] The judgment also enjoined defendants from engaging in any act thwarting the purpose of the agency agreement alleged in the underlying Complaint, i.e., the right to market and develop communication services on certain NPO PM satellite systems. We believe this injunction has been disregarded by Merkuriy, Sivirin and their successors-in-interest.

For the reasons set forth in detail below, Semtek now moves for the entry of a default judgment against ISS in the sum of $381,396,000, plus interest and costs (less the credits noted herein) and restatement of the injunctive relief obtained in the original 2000.

## SUMMARY OF ARGUMENT

For the Court's information, we offer a brief summary of this dispute and the factual context upon which this motion for entry of a default judgment rests.[2]  Following the first two defaults and continuing after the final default judgment was entered in 2000, a series of business consolidations and asset transfers took place involving essentially three companies: Merkuriy,

---

[1] Cash and stock valued at less than $15,000 was recovered from a third party creditor of Merkuriy. *See In re Leap Wireless*, U.S. Bankruptcy Court for the Southern District of California (San Diego) Case No. 03-03470A11-03535A11.

[2] Additional details concerning the original Semtek-Merkuriy lawsuit are set forth throughout the Affidavit of Pierre J. Quintana (hereinafter "Quintana Aff.").

NPO PM and ISS. ISS is the surviving successor corporation of Merkuriy and NPO PM and is liable for the default judgment entered against Merkuriy and Sivirin. NPO PM exercised pervasive control over Merkuriy's assets and business activities, and the asset transfer from Merkuriy to NPO PM to ISS constitutes a *de facto* merger of the three companies and is nothing more than a mere continuation of Merkuriy's business operations. To date, ISS, in contravention of the judgment, continues to market the commercial use of excess capacity on various NPO PM satellite systems, which was the basis for Semtek's underlying claims.

In the early 1990s, NPO PM created several small commercial arms, principal among them Merkuriy, as part of a multi-layered scheme designed to take advantage of potential western joint venture partners like Semtek. NPO PM initially held out these commercial entities as well-connected associated companies or agents with access to NPO PM's satellite systems. As a practical matter, investors who wanted to engage in Russian satellite business ventures had little choice but to negotiate and contract with front companies like Merkuriy.

From the time NPO PM established Merkuriy in 1991, NPO PM, a state owned satellite manufacturer, employing more than ten thousand personnel, exercised control over Merkuriy's access to NPO PM satellite assets and Merkuriy's role in marketing the transmission capacity on those satellites for commercial purposes on behalf of NPO PM and its executives.[3] To this end, NPO PM had the same officers simultaneously serving in the highest executive management positions of both companies; at the same offices and facilities; servicing the same customers; all in furtherance of the same business operations. In retrospect, Merkuriy appears to have been little more than a front or shell-company for NPO PM comprised of a handful of NPO PM executives

---

[3] NPO PM was the original founder and owner of Merkuriy. *See* ISS Letter dated April 22, 2009, Fawcett Aff., Ex. 4; *see also* Affidavit of Alexander Makotinski, Fawcett Aff., Ex. 5 at ¶ 6. Makotinski was an executive with Smalsat, another NPO PM "commercial arm." *Id.* at ¶¶ 2, 10.

with access to NPO PM satellite assets. In 1992, Semtek entered in a joint venture with Merkuriy to market access to NPO PM satellites for commercial purposes. The agreement was breached and thereafter litigation ensued.

At some time after the final default judgment was entered, NPO PM's control of Merkuriy gave way to a *de facto* merger when Merkuriy's key executives, facilities, assets and business operations were transferred to or absorbed by NPO PM, and Merkuriy as a practical matter, ceased operations. In short, NPO PM abandoned the facade of its "commercial marketing arm" and assumed direct and complete control over the marketing and development of a commercial communications satellite network for foreign customers, thus continuing Merkuriy's business enterprise. This was precisely the business opportunity underlying the Merkuriy/Semtek Agreement which Merkuriy breached leading to the final judgment and injunctive relief.

In March of 2008, NPO PM was transformed into ISS, a company wholly owned by the Russian Federation. According to ISS press releases and statements, ISS, the newly formed federal entity, acquired all NPO PM assets and obligations. *See* ISS Website: "Organizational and Legal Status" and ISS Press Release, dated March 3, 2008, Fawcett Aff., Ex. 2 and 3. The assets transferred to ISS include the right to market NPO PM's satellites. Taken together, the control and transfer of access to certain NPO PM satellite assets and commercial development rights related thereto, as well as the circumstances surrounding that transfer, warrant a finding that ISS is the legal successor to Merkuriy and NPO PM and subject to successor liability, including the obligation to pay the April 12, 2000 judgment.

Semtek's several attempts to resolve this matter with ISS failed, hence Semtek initiated litigation. On October 28, 2009, Semtek filed its Amended Complaint. ISS received the

Amended Complaint on December 10, 2009.[4] To date, ISS has not appeared in this matter.

## PROCEDURAL BACKGROUND

**The underlying Semtek-Merkuriy Litigation[5]**

On August 15, 1995, as a result of the breach of the joint venture agreement by Merkuriy, Semtek filed a complaint in this Court alleging, among other things, fraud, breach of contract, and RICO violations against Merkuriy and Pyotyr Sivirin, Merkuriy's Executive Director.

On April 24, 1996, after the defendants failed to appear, Judge Reginald C. Lindsay entered a default judgment for Semtek. Upon Merkuriy's motion for relief based on ineffective service, the Court vacated the default judgment.  Merkuriy was re-served, but once again defendants failed to appear. The Court issued a notice of default on March 4, 1998. Subsequently, Merkuriy and Sivirin appeared, requested relief and were given another opportunity to serve a late answer and defend the case on its merits.

On August 4, 1999, the Court granted Semtek's motion to compel defendants to comply with discovery.  After defendants failed to comply with that discovery order, the Court set a status conference for April 12, 2000 and notified Merkuriy and Sivirin that their failure to appear at the status conference would result in an entry of default. Not surprisingly, Merkuriy and Sivirin failed to appear and the Court entered the aforementioned final default judgment.

**Post Judgment**

Following the April 12, 2000 default judgment, development of the Loutch program seems to have been placed on hold and we found no evidence that Merkuriy continued any

---

[4]Before filing suit, Semtek sent a letter offering ISS an opportunity to discuss the claims.  Fawcett Aff., Ex. 4. A draft copy of the Complaint was included. ISS's Director, V.E. Kosenko, responded with general denials and false or misleading statements about NPO PM's relationship and involvement with Merkuriy and Semtek. Much like its defaulting predecessors, ISS's failure to appear is apparently a deliberate decision to avoid this litigation.

[5] Docket numbers for the below referenced filings are provided in Fawcett Aff. at ¶ 52.

related business operations. Thereafter, evidence of the Russian shell game of trying to obfuscate who controlled the Russian commercial satellite development rights that were the cornerstone of the Merkuriy-Semtek joint venture became more evident. Later, it became clear that ISS, as successor to Merkuriy and NPO PM, controlled the very same NPO PM satellites and marketing rights. It was also apparent that the transformation of NPO PM into ISS, which began sometime in 2007 and concluded in 2008, was part of a renewed effort to aggressively market the Loutch satellites for commercial use in violation of the injunction. NPO PM Press Release, dated April 16, 2007, Fawcett Aff., Ex. 6; ISS Magazine, dated June 2007 at 13-14, Fawcett Aff., Ex. 7.

Semtek made a series of unsuccessful efforts to resolve its claims arising from the judgment with the Russian parties. *See* Quintana Aff., at ¶¶ 44-46.  Semtek's efforts included retaining consultants to meet with representatives of the Russian Federation in Washington, D.C., and corresponding directly with ISS. When Semtek's efforts were rebuffed, it filed suit. *Id.*

**The Semtek-ISS litigation and ISS's failure to answer or appear**

This Court has jurisdiction over the claim.  *See* Amended Complaint, Docket No. 7, ¶¶ 6-9.  ISS has implicitly and expressly waived its immunity by acquiring the liabilities of its predecessors-in-interest and alter egos, and is bound by Merkuriy and Sivirin's (then an officer of NPO PM and Merkuriy) appearance and failure to raise any immunity defense. 28 U.S.C. § 1605(a)(1). NPO PM, through Sivirin, knew about the defaults, appearance, and the judgment, yet continued to exercise pervasive control over Merkuriy, eventually absorbing Mercuriy's assets and continuing its business operations.  For the reasons set forth below, such actions by a state entity's alter egos and predecessors-in-interest are attributable to the state entity, therefore ISS has effectively waived its privilege of immunity.

In addition, the conduct of ISS's predecessors-in-interest and alter egos, which arises from contracts with a U.S. company for marketing and development services to be primarily performed in the U.S. in order to provide transmission services to the U.S. market, triggers the commercial exception under the Act as such contracts are presumptively commercial. 28 U.S.C. § 1605(a)(2). The Supreme Court has analyzed the equitable principles to be considered in determining whether a corporate entity, based on the acts of certain other related entities, should be disregarded to avoid a fraud or injustice. *First National City Bank v. Bank Para El Comercio*, 42 U.S. 611, 629-31 (1983). The Court's rational supports the conclusion that, under appropriate circumstances, the acts of the state entity's alter ego or predecessor-in-interest may be attributable to a state entity when a failure to recognize the degree of control and disregard of the corporate form would work fraud or injustice. This same equitable principle applies with equal force when a *de facto* merger or mere continuation through succession results in an injustice. *See USF&G v. Braspetro Oil Services Co.*, 199 F.3d 94, 98 (2d Cir. 1999) (finding (1) acts of state entity's alter ego attributable to the state entity, (2) acts had a direct effect in the United States triggering the commercial exception, and (3) the state entity was not entitled to immunity).

The acts of NPO PM and Merkuriy, as alter egos and predecessors-in-interest of ISS, are attributable to ISS.  The course of conduct and commercial activities of Merkuriy, NPO PM and ISS which are set forth in detail below and in the accompanying affidavits supports a finding that the commercial exception applies. *See*, *infra*, at 13-18.  Here, the commercial activities include particular activities relating to the contract and fraud which occurred in the United States and commercial activities performed in the United States in connection with Merkuriy, NPO PM and ISS's commercial activity elsewhere.  Lastly, a "direct effect" obtains because Semtek lost money and suffered injury to its business as a result of the commercial activities abroad.

Lastly, ISS also does business in the United States by purchasing satellite components here for the Loutch and using U.S. financial institutions for services and payments relating to its satellite business.

ISS received the Amended Complaint and Summons on December 10, 2009. *See* Docket No. 10 Mail Receipts. To date, ISS has not answered or appeared in this matter. On July 27, 2010, the Clerk of Court entered a Notice of Default against ISS.

## FACTUAL BACKGROUND

After the fall of the Soviet Union, the Russian Federation began to reorganize inefficient and sometimes corrupt state owned enterprises, and the valuable assets they managed, into entities that could more effectively participate in global commercial markets. Because the former "Soviet" space industry was completely funded by the State, the Russian Federation lacked adequate funding to sustain the enormous budgets necessary to continue development in the space sector. To this end, the typical post-Soviet business model for many state-owned enterprises, including those in the space industries, involved the creation of subordinate companies which remained under the supervision and control of state-owned enterprises. These companies were typically used as commercial arms of the larger state-owned entities to identify western investors to market and develop commercial opportunities using state owned assets. *See generally*, "Failure of Russian Privatization 1992-1994" Dr. Kent F. Moors (Journal of International Studies Winter 1997), Fawcett Aff., Ex. 8 (selected excerpts); [6] David E. Hoffman, "*The Oligarchs*" (U.S. Public Affairs 2002), Fawcett Aff., Ex. 9 (selected excerpts). In the early 1990s, such a business model was developed by NPO PM in order to create Merkuriy.

---

[6] The ISS letter of April 22, 2009 claims that Russian Presidential Edict 721 was responsible for divesting NPO PM of its ownership of Merkuriy. While technically true, Dr. Moors notes that this edict resulted in increased control over the assets of the state-owned enterprises by their directors. *See* p. 8.

**NPO PM creates Merkuriy to deal with western joint venture partners**

NPO PM was founded in 1959 as a Soviet-owned government enterprise. *See* ISS Website Entry: "Enterprise History," Fawcett Aff., Ex. 10. NPO PM grew to become the leading company within the Russian space industry specializing in the manufacture and development of satellite systems and related technologies. *Id.* In 2008, NPO PM was transformed into a successor entity known as ISS and remained a state owned enterprise. Fawcett Aff., Ex. 3.

Since it was founded, NPO PM's headquarters and principal place of business were located in a closed city in Siberia known, at that time, as Krasnoyarsk-26. Krasnoyarsk-26 is over 2,000 miles from Moscow and was established by the Soviet government to become the center of the Soviet space industry. For many years, this location was top-secret, did not appear on maps and was off-limits to foreigners. Although still often referred to as K-26, it is now called Zheleznogorsk and the complex remains the corporate headquarters for NPO PM's successor, ISS. See Fawcett Aff., Ex. 10; Overview of Zheleznogorsk, Fawcett Aff., Ex. 11; *The Hidden City*, New York Times, November 18, 1998, Fawcett Aff., Ex. 12.

One of NPO PM's product lines developed in the late 1970s and early 1980s was the Loutch (also called LUCH) multi-purpose data relay satellite. *See* Fawcett Aff., Ex. 7. The Loutch satellites were exclusively used by the Russian Ministry of Defense for military projects until the early 1990's. *See* "ISS History 1981-1990", Fawcett Aff., Ex. 13. After the collapse of the Soviet Union, NPO PM determined that excess communications capacity on the Loutch satellite relay system could be developed for commercial purposes. *See* Fawcett Aff., Ex. 5 at ¶6.

To this end, in 1991, NPO PM created a marketing entity known as Merkuriy. Initially, Merkuriy's sole shareholders were NPO PM and another state-owned satellite telecommunications agency. *Id.* Merkuriy had three officers, all of whom were senior NPO PM

executives. *See* Fawcett Aff., Ex. 5 at ¶¶ 8-9 (addressing Sivirin and Reshetnev); Declaration of Pyotr Sivirin, Fawcett Aff., Ex. 14 at ¶ 4. Merkuriy's primary business purpose was to market and coordinate the potential commercial applications of the Loutch and other NPO PM-manufactured satellites to foreign customers on behalf of NPO PM. *See* Fawcett Aff., Ex.5 at ¶ 6; Quintana Aff. at ¶¶ 37-39. Merkuriy had no tangible assets other than the access NPO PM provided to its satellite systems. See Quintana Aff. at ¶¶ 37, 43. NPO PM installed its own executives at the helm of Merkuriy; located the company headquarters within NPO PM's top-secret and "off-limits" office complex at Krasnoyarsk-26; and, directed Merkury, its "commercial arm" and "designee" to perform certain functions in furtherance of NPO PM's satellite communications business. Fawcett Aff., Ex. 5 at ¶¶ 8-9, 22; Ex. 14 at ¶ 3, 4 and 6; ITAR-TASS Press Release, dated June 19, 1997, Fawcett Aff., Ex. 15.

In retrospect, NPO PM's control over its business relationship with Merkuriy was quite substantial. Merkuriy has been described by knowledgeable people in the satellite industry as, "the daughter [of NPO PM]," "commercial arm" and "one in the same as NPO PM]." Montague and Ursini Depositions, Fawcett Aff., Ex. 16 at 105-106 and 186, Fawcett Aff., Ex. 15 and 17.[7]

**NPO PM and Merkuriy share the same officers, location, assets and business operations**

From the time of its creation until it ceased operations, Merkuriy shared the same exact business address, telephone facsimile number and telegraph address as NPO PM.[8]  In addition, Merkuriy and NPO PM had the same key management personnel, serviced the same clients and had the same business purpose.  For years, this business relationship allowed NPO PM to use

---

[7] John E. Montague was Vice President of Financial Strategies and Samuel M. Ursini was a business executive for Lockheed Martin involved in the Merkuriy/NPO PM satellite projects.

[8] By late 1998, in an obvious attempt to avoid the initial default judgments in the instant case, Merkuriy changed its name to Merkuriy (Mercury) Telesat. All key management personnel, location and business operations of this legal successor remained exactly the same. Hereinafter, the entities are collectively referred to as "Merkuriy". See Quintana Aff. at ¶ 37; Fawcett Aff. at ¶ 22 .

Merkuriy as a mere conduit for the transaction of its own business purposes.  Eventually, following the April 12, 2000 default judgment, Merkuriy ceased ordinary business operations and its assets, including its offices, officers, licenses, clients and business operations, were merged or consolidated into NPO PM (now ISS), which remains, in part, nothing more than a mere continuation of the now defunct Merkuriy entity. Notably, ISS now possesses the same exclusive rights to market and commercialize certain Russian satellite assets, including the latest generation of Loutch satellites, which Merkuriy and NPO PM once held.

### Same offices and administrative communications devices

Like NPO PM and ISS, Merkuriy's principal place of business was 52 Lenin Street, 660033 Krasnoyarsk, Siberia, with the same telephone number, (391) 972-2635, and telegraph address, "VULKAN".  *See* Fawcett Aff., Ex. 14 at ¶ 3 and 6 and Ex. 4; July 30, 1993 Letter, Fawcett Aff., Ex. 18; July 5, 1994 Letter, Fawcett Aff., Ex. 19; December 3, 1992 Letter, Fawcett Aff., Ex. 20; June 16, 1993 Letter, Fawcett Aff., Ex. 21.

### Same executive officers

From NPO PM's earliest days until his death in 1996, Mikhail Reshetnev served as the General Designer and General Director of NPO PM. Reshetnev was a well known figure in the field of satellite communications. Indeed, ISS, the successor to NPO PM, bears his name and is often referred to as the "Reshetnev Company" or "ISS-Reshetnev." Fawcett Aff., Ex. 7.  He was responsible for the first satellite contract with a western customer. *Id.* at 22. Reshetnev supervised the development and marketing of the Loutch satellites and was involved in the Semtek-Merkuriy deal.  Significantly, Reshetnev also simultaneously served as Chairman and President of Merkuriy, from its founding in 1991 until his death in 1996. Fawcett Aff., Ex. 14 at ¶ 4; Fawcett Aff., Ex. 5 at ¶ 8.

Two other officers, Pyotr Sivirin, Merkuriy's Executive Director, and Alexander Filyushin, Merkuriy's technical director, served concurrently as key NPO PM executives. *See* Fawcett Aff., Ex. 5 at ¶ 9, Ex. 17, Ex. 14 at ¶ 4, Ex. 21 (Sivirin signed on behalf of NPO PM and Merkuriy), and, NPO PM Letter dated July 8, 1993, Fawcett Aff., Ex. 22 (same). Sivirin was responsible for administering the affairs of Merkuriy on a day-to-day basis. *See* Fawcett Aff., Ex. 5 at ¶ 11. At the same time, Sivirin also served as the Deputy Designer General and Assistant Chief Designer at NPO PM. *See* Fawcett Aff., Ex. 21 and 22. Sivirin continued to work for NPO PM and ISS in senior positions even after NPO PM ceased using the "Merkuriy" front companies. In 2003 and 2004, Sivirin represented NPO PM at various conventions and sponsored a high-level foreign delegation. *See Brief News*, Fawcett Aff., Ex. 23; Fawcett Aff. at ¶ 30. In 2009, Sivirin, representing ISS, made a joint presentation with the company's General Director at an international conference. *See* International Workshop, Fawcett Aff., Ex. 24.

These dual-hatted chief executives, Messrs. Sivirin and Reshetnev, often signed correspondence and agreements on behalf of both NPO PM and Merkuriy, disregarding the allegedly separate nature of the business entities. For example, in correspondence relating to the Semtek-Merkuriy agreement, dated June 6, 1993 and July 8, 1993 and bearing NPO PM letter head, Sivirin signed as both the Executive Director of Merkuriy and Deputy Designer General of NPO PM. Fawcett Aff., Ex. 21 and 22. In this correspondence Sivirin spoke on behalf of NPO PM and made commitments to assist Semtek in obtaining satellite transponders while at the same time authorizing Semtek to act as NPO PM's agent in soliciting customers. *Id.*

### Same assets and business purpose

In 1992, in order to further its efforts to attract funding from western investors, NPO PM and the Russian Ministry of Defense authorized Merkuriy to use the Loutch satellite system to

promote a commercial communications network on behalf of NPO PM and the Russian Military. *See* Decision, dated July 10, 1992 Fawcett Aff., Ex. 25. Such authorization and access to NPO PM satellites, including the Loutch, was essentially Merkuriy's sole asset and the ability to market commercial applications was Merkuriy's primary business purpose. Quintana Aff. at ¶¶ 37-39, 43. The decision provides that the Russian government would recoup from Merkuriy certain expenses associated with the use of the satellites and that funds obtained would be appropriated to purchase "production models of the system" and "developing space-related equipment." Fawcett Aff., Ex. 25. NPO PM signed and approved the decision and, as the satellite manufacturer for these systems, such monies were clearly payments directly to NPO PM.

The evidence demonstrates that from at least the early 1990s to the present, NPO PM (now ISS) was in the business of developing and marketing NPO PM satellite systems, including the Loutch, for various commercial communication purposes. Merkuriy, under NPO PM's control, was engaged in the exact same business until NPO PM  stopped using Merkuriy as its "commercial arm," and began direct marketing of excess transmission capacity on the Loutch.

**The Semtek-Merkuriy Agreement**

Semtek was a Massachusetts corporation co-founded in 1992 by Dr. Edward Shapiro, a Russian born physicist and engineer living in Boston, along with several other experienced and credentialed scientists, entrepreneurs and executives, to explore business opportunities in Russia. By the late 1980s, the vast potential of satellite telecommunications was being realized by a number of successful start-up ventures. This advantageous business climate, combined with Dr. Shapiro's close contacts with the Russian scientific community and the relatively low-cost of Russian space technology, caused Semtek to focus its efforts on the Russian satellite industry.

Thereafter, Dr. Shapiro established a business relationship with Merkuriy through its Executive Director Pyotr Sivirin and Chairman Mikhail Reshetnev.  *See* Quintana Aff., ¶¶ 4-7.

In 1992, Merkuiry and Semtek, with the approval and support of NPO PM, embarked on a business relationship with the aim of commercializing the excess communications capacity of various NPO PM satellites. *See* Quintana Aff., ¶¶ 4-7, 22 .  On November 5, 1992, Semtek and Merkuriy entered into an agreement to cooperate "in development and use of commercial satellite systems for communications and TV broadcasting."  *See* Business Agreement, dated November 5, 1992, Fawcett Aff., Ex. 26.  On or about December 18, 1992, Semtek and Merkuriy further agreed to establish a joint venture relationship "[t]o market on a world-wide basis, spacecraft including low earth orbit and geosynchronous satellites for commercial communications"  *See* Protocol, dated December 18, 1992, Fawcett Aff., Ex. 27.  Semtek understood that a primary purpose of this Agreement was to provide commercial satellite services in the United States.  Fawcett Aff., ¶ 34. Subsequently, Merkuriy authorized Semtek to act as its agent to market communications channels on the Loutch satellite and apply to the FCC for a license to facilitate commercial exploitation of the Loutch satellite in the U.S.  *See* February 8, 1993 Letter, Fawcett Aff., Ex. 28.

On May 2, 1993, Semtek and Merkuriy further agreed the joint venture was to have exclusive "authority to market, sell, lease or otherwise assign . . . satellites. . . ." until December 31, 1994. *See* Joint Venture Agreement, dated May 2, 1993, Fawcett Aff., Ex. 29.  In reliance upon the joint venture agreement, Semtek made a significant monetary investment to meet its obligations and bring the venture to profitability.  *See* Quintana Aff., ¶¶ 7-11. Thereafter, Semtek undertook technical due diligence here in the United States by, among other things, developing a business plan; commissioning a market study; retaining investment advisors, marketing

personnel and technical experts; and, evaluating modifications to adapt the Loutch Satellites for commercial use. *See* Quintana Aff., ¶¶ 7-11; *see also* Excerpts from Expert Report of Dr. James R. Stuart, dated May 5, 2003, Fawcett Aff., Ex. 30.

**Merkuriy/NPO PM breach the Semtek contract to work with Transworld Communications**

While dealing on the one hand with Semtek, Reshetnev and Sivirin, the chief executive officers at NPO PM and Merkuriy, had been simultaneously engaged with other United States-based corporations in an effort to find a more lucrative deal to develop the very same satellite venture. One such company was Transworld Communications (U.S.A.), Inc. ("Transworld") which, through its chairman, Richard Millman, acting as a middle man for Martin Marietta (now Lockheed Martin), entered into multiple agreements similar to the Semtek-Merkuriy joint venture agreement. See Quintana Aff. at ¶¶ 18, 36, 40; *see also*, *e.g.*, NPO PM/Transworld Agreement, dated April 16, 1993, Fawcett Aff., Ex. 31. In July 1994, NPO PM and Merkuriy concluded they stood more to gain going into business with Transworld and Lockheed andy 1994 breached the agreement with Semtek. *See* Letter dated July 27, 1994, Fawcett Aff., Ex. 32.[9]

Through at least the late 1990s, Transworld continued to contract directly with NPO PM and its commercial arms, including Merkuriy, in an effort to commercially exploit the very same satellite assets that were the cornerstone of the Semtek-Merkuriy joint venture agreement, including the Loutch satellite. *See* Quintana Aff. at ¶ 40; Fawcett Aff., Ex. 15. During this timeframe, NPO PM continued to use Merkuriy, by holding them out as their designated commercial instrument for business dealings with western companies. *Id*. These dealings were marked by varying levels of control and subterfuge depending upon the business decisions of

---

[9] Notably, Semtek obtained a favorable ruling from the U.S. Supreme Court in a related litigation arising from these transactions with Lockheed. *See Semtek International Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001).

NPO PM's leadership.  Reshetnev himself perhaps said it best, shortly before his death, in a 1995 interview with the respected journal Space News:

> "Q: How do you decide when to act as a state enterprise, and when to act as a private company?
>
> A: The situation usually dictates our choice. When it is advantageous for us to act as a private stock company, we act that way. When it is disadvantageous, we act as a state company."

*See* Space News Business Report, dated September 18, 1995, Fawcett Aff., Ex. 33. The advantage of which Reshetnev spoke was the ability of NPO PM to take on different business forms to include front companies, like Merkuriy, which operated under the control of NPO PM executives. These shell companies enabled NPO PM to negotiate with multiple western suitors in order to maximize their bargaining effectiveness and get the best deal for NPO PM.

The business dealings between Transworld and NPO PM are further evidence of NPO PM's control over the subject satellite assets and related business operations throughout the 1990s. As described by Reshetnev, NPO PM was the prime participant in the "Loutch I and Loutch II projects" which were designed "to establish international telecommunications systems." *See* NPO PM Letter dated September 9, 1994, Fawcett Aff., Ex. 34 and Ex. 31.[10]

According to Reshetnev, this earlier Transworld-NPO PM deal contemplated payments to Merkuriy and another NPO PM commercial arm known as SMALSAT. *Id.* Reshetnev, solely in his capacity as NPO PM Chairman of the Board, unilaterally cancelled the agreement with Transworld. *Id.* Ultimately, the Transworld-NPO PM deal concerning the same satellite assets and commercial business opportunity involved in the Semtek joint venture turned sour.

---

[10] The agreement and letterhead refer to "Shareholding Company NPO PM."  The Shareholding Company is nothing more than another Reshetnev controlled shell entity without any assets.  *See* Fawcett Aff., Ex. 5 at ¶ 7.

In 1998, after settling their differences, NPO PM again dealt directly with Transworld to further its efforts to market the Loutch satellites. Quintana Aff. at ¶ 40.  By this time, NPO PM was exploring commercial options using the next-generation Loutch 3 satellite systems. *Id.*  In connection with this project, NPO PM instructed Transworld to pay Merkuriy for NPO PM's work, even though Merkuriy was not a party to the contract. *See* Letter dated January 14, 1999, Fawcett Aff., Ex. 35.[11] The document confirms the companies had the same address and same bank. That NPO PM had Merkuriy's banking information and directed payment on Merkuriy's behalf suggests Merkuriy was a mere financial conduit for NPO PM and its executives.

After the in-flight failure of a Loutch 2 series satellite, the Transworld-NPO PM efforts to develop the Loutch series satellites for commercial purposes stalled in late 1999 and early 2000. *See* Quintana Aff. at ¶ 42. Soon thereafter, Transworld was liquidated and dissolved.  *See* Leap Wireless Excerpt of SEC Filing, dated June 29, 2000, Fawcett Aff., Ex. 36.

Eventually, NPO PM's shell game involving "commercial arms" came full circle and sometime after the final default judgment, Merkuriy, by then using the name Merkuriy Telesat, ceased operations and was later subjected to liquidation proceedings. *See* Fawcett Aff. at ¶ 22. By this time, the right to develop and market Loutch satellite assets for commercial purposes was in NPO PM's sole and exclusive possession.

**NPO PM's successor, ISS, has NPO PM's assets and is responsible for its obligations**

In 2006, the Russian Space Agency's (RSA) proposal to transform NPO PM into ISS was approved.  *See* June 9, 2006 Decree, Fawcett Aff., Ex. 37.  As a result, on March 3, 2008, NPO PM was reorganized into Information Satellite Systems (ISS). *See* JSC Information Satellite Systems Reshetnev Company, Fawcett Aff., Ex. 38.  Under the reorganization, ISS remained

---

[11] Pursuant to this Court Order, this document is being filed separately under seal.

state-owned and acknowledged it was "the successor" to NPO PM with all NPO PM obligations being transferred to ISS, the new federal possession. *See* Fawcett Aff., Ex. 2 and 38. ISS is headquartered at the same location, has the same officers, management personnel, employees and is engaged in the same business as its predecessor NPO PM. Fawcett Aff. at ¶ 49.

As described in an ISS press release concerning the reorganization, "[t]he main activities for [ISS] as well as for NPO PM are **still** multimission spacecraft development and creation." *See* Fawcett Aff., Ex. 38.  On its website, NPO PM (now ISS) stated that the Loutch is one of the satellites it has "been successfully operating on [a] commercial basis to provide service to foreign users." *See* "Achievements in Space Activity," Fawcett Aff., Ex. 39.   In fact, on its international client contacts page, the NPO PM/ISS website indicates a long term relationship with Lockheed Martin concerning the Loutch satellite system beginning in 1994.[12]  *See* "International Contacts," Fawcett Aff., Ex. 40.

Starting in 2007 and continuing to this day, ISS has continued its efforts to actively develop and market the current model Loutch satellite systems for commercial use in providing international telecommunications satellite services.[13] The ISS business plan includes the development of the next generation of Loutch satellites, known as Loutch 5A and 5B. *See* Fawcett Aff., Ex. 7. Indeed, ISS is planning to launch a Loutch satellite to the same position (16W) identified in the Semtek-Merkuriy Agreement which would enable ISS to provide commercial satellite services in the United States. Fawcett Aff. at ¶ 9.

---

[12]As a further sign of its tangled and self-serving business dealings, in December 1994, when the Transworld-NPO PM satellite deal was coming apart, Reshetnev, acting as Chairman of NPO PM, contacted Martin Marietta (now Lockheed Martin) directly to develop the very same satellite-based telecommunications network and, in effect, bypass both Semtek and Transworld.  *See* Quintana Aff. at ¶ 36.

[13] See ISS website entries: NPO PM International Aerospace Show, Le Bourget, France, June 21, 2007;  ISS Participates in AIRSHOW China, November 5, 2008; ISS at Latin American Aerospace and Defence Trade Show, April 15, 2009; ISS at the International Air and Space Fair, March 23, 2010, Fawcett Aff., Ex. 41.

**ISS's false and misleading response to Semtek**

As noted above, Semtek contacted ISS by letter and, on April 22, 2009, received a response from the General Director of ISS, V.E. Kosenko, which was wholly disingenuous and demonstrably false.[14]   Kosenko states that since July 1, 1992 there are no legal or financial relations between NPO PM and Merkuriy and after November 1992, NPO PM did not participate in further relations between Semtek and Merkuriy. Fawcett Aff., Ex. 4.   These statements are refuted by NPO PM's own documents which show, for example, that (1) on July 10, 1992, NPO PM authorized Merkuriy to make commercial use of the Loutch satellites; (2) after November 1992, NPO PM responded directly to Semtek, in support of their collective efforts pursuant to the Merkuriy-Semtek agreement, by assisting Semtek in obtaining  transponders; (3) after November 1992, NPO PM specifically authorized Semtek to serve as its agent to find customers to participate in this commercial  satellite venture; and (4) in 1999, NPO PM directed payment to Merkuriy for work related to the Loutch satellite project with Transworld. *See* Fawcett Exs. 25, 22, 21 and 35; Quintana Aff. at ¶¶ 36, 40. Such business dealings are a far cry from "no further relations" given that the business relationship continued until Merkuriy ceased operations.

## ARGUMENT

ISS is liable for the damages and injunctive relief set forth in the April 12, 2000 default judgment because it is the successor-in-interest to Merkuriy and NPO PM. The evidence also demonstrates that ISS's predecessor, NPO PM, had an agency, alter ego or similar relationship with Merkuriy, wherein NPO PM exercised pervasive control over Merkuriy and intermingled assets, key personnel and business activities concerning the Loutch satellite such that NPO PM should be held responsible for any liabilities of Merkuriy. ISS has assumed the obligations of its

---

[14] Semtek responded to ISS's letter requesting additional information and documents supporting ISS's claims, but received no further response.

predecessors, including the obligation to pay the judgment against Merkuriy and Sivirin. Merkuriy's tangible and intangible assets are in ISS's possession and control, and the liabilities and obligations of ISS's predecessors were transferred together with those assets by reason of the *de facto* merger and mere business continuation described herein.

### Legal Standard

Because ISS is an instrumentality or agency of the Russian Federation, Semtek must establish its "claim or right to relief by evidence satisfactory to the court." 28 U.S.C. §1608 (e). In cases involving a foreign sovereign, one court found persuasive the First Circuit standard that "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *See e.g.*, *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F.Supp.2d 217, 222-224 (S.D.N.Y. 2003) (nonetheless adopting "a reasonable jury" standard) (*citing Alameda v. Secretary of Health, Education & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980).

In light of ISS's default, the court should accept the plaintiff's uncontested evidence and affidavits as true, *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 24 (D.D.C. 2008), and draw all reasonable inferences in Semtek's favor. Here, Semtek has presented a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff.

**NPO PM (now ISS) is Liable for Merkuriy's Debts**
**as a Result of its Controlling Relationship over Merkuriy**

The record evidence set forth above demonstrates that an agency, alter ego or other relationship existed by virtue of NPO PM's active, direct and pervasive control over Merkuriy and the intermingling of assets relating to their united interest concerning the development of commercial capacity on the Loutch satellite. *See generally*, *My Bead Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1969) (recognizing shared liability based on pervasive control and direct participation by one company over another).

Courts consider a twelve-factor test to determine if a corporation is an alter ego. *See Dept. of Public Health v. M.C.K., Inc.*, 432 Mass. 546, 536 n. 19 (Mass. 2000) (listing factors). In *M.C.K.*, the trial court's disregard of the corporate entity was upheld based on findings demonstrating: "pervasive control; confused intermingling of activity and assets; the existence of a common enterprise; thin capitalization; failure to observe corporate formalities; and substantial disregard of corporate entities." *Id.* at 556-57.

Here, there is ample evidence that: (1) NPO PM executives work concurrently for Merkuriy and exercised pervasive control; (2) NPO PM controlled Merkuriy's marketing effort as part of a common enterprise concerning satellite development; and, (3) the marketing and development of the Loutch satellites were intermingled between the two companies. In addition, Merkuriy was thinly capitalized and on numerous occasions corporate formalities were disregarded when the executives exercised their duties on behalf of both companies. Fawcett Aff. at ¶ 22. As such, NPO PM's relationship with Merkuriy warrants a finding that NPO PM (now ISS) is responsible for Merkuriy's liabilities.

**Merkuriy's Debts and Obligations Were Transferred to NPO PM (now ISS)**

Most jurisdictions, including Massachusetts, recognized that a party to whom assets are transferred succeeds to the debts and liabilities of the transferor when (1) the successor expressly or impliedly assumes liability of the predecessor; (2) the transaction between them amounts to a consolidation or merger; (3) the transferee is merely a continuation of the transferor; or (4) the transfer is entered into fraudulently in order to escape liability for debts. *See Milliken & Company v. Duro Textiles, LLC*, 451 Mass. 547, 556 (2008). The *Milliken* decision is instructive and combines the factors from the "*de facto* merger" and "mere continuation" factors for its

analysis.[15]  As to the "*de facto* merger" theory, the *Milliken* court recognized that successor liability is established when "the ownership, assets and management of one corporation are combined with those of another, preexisting entity." *Id.* at 587, *citing*, *National Gypsum Co. v. Continental Brands Corp.*, 895 F.Supp. 328, 336 (D.Mass. 1995).

Significantly, even if parties have not formally merged, as may be the case with NPO PM and its subordinate commercial arm, Merkuriy, if they "have nevertheless achieved virtually all the results of a merger, a court may hold the surviving corporation liable for the conduct of the transferor corporation as if the merger were *de jure.*" *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 712 F.Supp. 1010, 1015 (D. Mass. 1989) (citations omitted).  Massachusetts courts consider the following factors in deciding whether to characterize a change in status as a *de facto* merger:

(1)     continuation of the predecessor enterprise, so that there is continuity of management, personnel, physical location, assets and general business operations;

(2)     continuity of shareholders;

(3)     cessation of the predecessor corporation's ordinary business operations, with the predecessor liquidating and dissolving as soon as is legally and practically possible;

(4)     assumption by successor corporation of predecessor's obligations ordinarily necessary for the uninterrupted continuation of the normal business of the predecessor corporation. *Id.*

The *Milliken* court also noted that the "mere continuation" theory of successor liability "envisions a reorganization transforming a single company from one corporate entity into another." *Milliken*, 451 Mass. at 557 (citation omitted).  According to *Milliken*, such factors as continuity of directors, officers, and stockholders, as well as the continued existence of only one corporation after the sale or transfer of assets, support a finding under the "mere continuation"

---

[15] The terms "*de facto* merger" and "mere continuation" are used interchangeably and appear to refer to the same concept.  *Id.* at n. 15.

theory.  *Id*.  In essence, the *Milliken* court sought to determine if the successor is merely a "new hat" for the predecessor which justifies the imposition of liability where, "in substance if not in form," the successor corporation is essentially the same company as the predecessor corporation. *Id*. at 557-581 (citations omitted).  Significantly, as to the factors underlying a finding of a "*de facto* merger," or "mere continuation," no single factor is dispositive, necessary or sufficient and the facts of each case must be examined independently.  *Id*. at 557-59 (citations omitted).

Relevant in *Milliken* were findings that the predecessor: (1) had ceased operations following the asset transfer; (2) no longer had offices or employees; (3) had the same  CEO as the successor; and (4) by transferring its operating assets, allowed the successors to continue the same business.  *Id*. at 559; *see also*, *National Gympsum*, 995 F. Supp. at 342 (finding successor liability where the successor continued the predecessor's business operations, employed the same management and the predecessor was essentially without assets after the transaction).

Similarly, in *Acushnet River*, the court found a continuity of enterprise because, among other things, the president, vice-president, and the treasurer of the predecessor and the successor were the same; the business operations and production line were the same; and the same physical facilities were used, as well as the same banking and insurance entities.  *Acushnet River*, 712 F.Supp. at 1015-16.  Like the *Milliken*, *Acushnet River* and *National Gypsum* cases, Merkuriy's executives were also NPO PM executives; the two entities used the same physical facilities at the K-26 complex; they shared telephone and telefax numbers; the same bank; and, the same key business asset – the commercialization of excess capacity on the Loutch satellite.  Furthermore, Merkuriy was essentially without assets and ceased operations once NPO PM took control of marketing the Loutch satellites.

NPO PM is Merkuriy's successor because, through its officers and directors, who acted in a dual capacity and often conducted themselves interchangeably on behalf of both companies, NPO PM exercised pervasive and direct control over Merkuriy, and the commercial satellite development opportunity at issue, such that Merkuriy was a mere shell company for NPO PM and its executives.   Moreover, NPO PM and Merkuriy were joined in a common enterprise concerning commercial marketing of NPO PM satellites for many years and this structure remained more or less unchanged until Merkuriy ceased operations, resulting in the transfer of its key asset – the right to commercially market the Loutch and other NPO PM satellites -- to NPO PM which constitutes a *de facto* merger or nothing more than a mere continuation of Merkuriy. NPO PM continued to market its commercial satellite communications business to the same customers from the same location with the same officers. Thereafter, ISS assumed NPO PM's assets and obligations in conjunction with the 2008 merger.   The NPO PM "transformation" into ISS is also a *de facto* merger or mere continuation.  The new ISS is the same as the old NPO PM: same location; same officers (including Sivirin) and employees; same business activities and assets; and, same ownership interest, as the state owns both entities.  ISS owns the same Loutch satellite development rights once controlled and owned by NPO PM and Merkuriy.

Having thus continued the NPO PM-Merkuriy enterprise – with continuity of management, personnel, physical location, assets, general business operations – and having assumed those assets and obligations of NPO PM and Merkuriy necessary to continue to market and sell the excess commercial capacity on the Loutch satellites, ISS is therefore liable for Merkuriy's debts and liabilities, including the terms of the April 12, 2000 judgment.

## CONCLUSION

For all of the foregoing reasons, Semtek respectfully requests that this Court enter an

Order of Default Judgment against ISS.

Dated: August  26, 2010
       Boston, Massachusetts

Respectfully submitted,

KREINDLER & KREINDLER LLP

_/s/ Anthony Tarricone ____
Anthony Tarricone (BBO# 492480)
Joseph P. Musacchio (BBO# 365270)
277 Dartmouth Street Boston, MA 02116
Telephone: (617) 424-9100
Facsimile: (617) 424-9120
atarricone@kreindler.com
musacchio@kreindler.com

- and –

Marc S. Moller
Brian J. Alexander
100 Park Avenue
New York, New York 10017
Telephone: (212) 687-8181
Facsimile: (212) 972-9432
balexander@kreindler.com
mmoller@kreindler.com

*Attorneys for Plaintiff SEMTEK*