UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------------x

SEMTEK INTERNATIONAL INCORPORATED,

                        Plaintiff,

   -   against –

INFORMATION SATELLITE SYSTEMS /AKA/
"ACADEMICIAN M.F. RESHETNEV INFORMATION
SATELLITE SYSTEMS" /AKA/ "ISS-RESHETNEV
COMPANY," /AKA/ "ACADEMICIAN M.F.
RESHETNEV NAUCHNO-PROIZVODSTVENNOE
OBIEDINENIE PRIKLADNOI MEKHANIKI"
/AKA/ "NPO PM,"

                        Defendant

---------------------------------------------------------------------x

Civil Action No.:
1:09-cv-10183-RWZ

**AFFIDAVIT OF PIERRE J. QUINTANA**

PIERRE J. QUINTANA, being duly sworn, deposes, and says:

1.      I have been a businessman for over 40 years, working in the fields of international

trade. My work has taken me to over two dozen countries. I am 69 years old.

2.      In the summer of 1992, I was approached by Jim Newkirk to consider investing in

a new company called Semtek International Inc. One of Semtek's founders, Edward Shapiro, a

Russian-American engineer and physicist, felt that the collapse of communism in the Soviet

Union, provided opportunities for western business to collaborate with highly educated and

technically proficient Russian would-be entrepreneurs.

3.      Semtek's idea was to market within the U.S. products using existing Russian

infrastructure and technology. Russian satellites met Semtek's criteria as the designing,

manufacturing and in some case launching of the 'satellites' was already done. Semtek felt that

the excess capacity of the satellite transponders could be marketed in the U.S. at a lower cost than existing non-Russian satellites. Semtek's proposed market included many U.S-based and other international media outlets which were requiring ever increasing amounts of satellite time for the transmission of television and other data to their U.S and global audiences.

    4.    After numerous telephone conversations between Mr. Shapiro and various Russian officials, Semtek was directed towards a person by the name of Pyotyr Sivirin.

    5.    In November, 1992, at the invitation of Pyotyr Sivirin, I and three others travelled as a Semtek delegation to Moscow in order to meet with Sivirin and other prospective Russian partners. We later learned that Mikhail Reshetnev was Sivirin's boss.

    6.    On November 5, 1992, I was present when Edward Shapiro as a representative of Semtek and Pyotyr Sivirin as a representative of Merkuriy Ltd signed a Business Agreement regarding the use of commercial satellite systems for communication and television broadcasts.

    7.    The following month, I returned to Russia as part of a three-member Semtek delegation which included Semtek's satellite expert for follow-on meetings with Sivirin. On December 18, 1992 in Moscow Semtek and Merkuriy signed a Protocol. This Agreement reaffirmed the prior Business Agreement and further defined the obligations of the two parties. The Agreement described the proposed use of the Loutch (also called Luch) satellite located at 16 degrees West Longitude (Loutch 16W) as had been discussed in the November 1992 meetings which led to the November 5, 1992 Business Agreement. This location allows commercial transmissions to the U.S. which was the primary purpose of the Agreement. The Agreement also noted that Merkuriy had provided technical specifications for the Loutch 16W to Semtek. The Agreement noted Semtek's efforts already undertaken in identifying and meeting with potential customers of satellite services to be provided by the Semtek/Merkuriy use of the Loutch 16W.

In addition, the Agreement required Semtek to begin marketing the satellite services. The Agreement also envisioned that following the successful marketing of the Loutch 16W services, other subsequent satellites would be employed. Semtek subsequently made a significant monetary investment to meet these obligations and conducted nearly all of its work in the U.S.

8.      Semtek continued its efforts to develop clientele for the Semtek-Merkuriy venture. Semtek also began work on acquiring the necessary regulatory approval of the U.S. government. To this purpose, Merkuriy faxed a letter to Mr. Shapiro in his capacity as President of Semtek, delegating Merkuriy's authority to Semtek to act as its agent and to support Semtek's application to the U.S. Federal Communications Commission for the right to use Loutch retransmission channels on U.S. territory.

9.      At this point Semtek also commissioned an extensive market survey from Centrex Communications, a respected satellite communications consultancy company in the U.S., to confirm the viability of the project. Sivirin later approved the survey results.

10.     On May 2, 1993 Semtek and Merkuriy signed a further agreement to form a Joint Venture regarding the marketing of the Loutch 16W and transponders on other satellites. We at Semtek already considered that we had a contractual arrangement with Merkuriy via the previous documents. The Agreement was for the purposes of establishing a mechanism by which we would implement the contract, e.g. to create a joint venture.

11.     Throughout the following year, Semtek and Merkuriy continued our efforts to market the Loutch. Semtek had protracted negotiations which led to a contract with State Street, an investment bank regarding raising the necessary capital. Semtek and Merkuriy drafted several versions of a business plan. Semtek and Merkuriy met in Washington D.C. in December, 1993 to review necessary satellite modifications and define costs of the joint venture. Sivirin

3

approved the business plan.

      12.    It was during this period, May 1993 through the spring of 1994 that we at Semtek began to feel a little uneasy at continual delays in the project from Merkuriy's side.  The delays were in identifying the exact costs necessary to make the minor modifications needed for using the Loutch satellite as well as delays in establishing the joint venture.  But we put these delays down to the difficulties Merkuriy was experiencing in what was an obviously chaotic and frustrating political and economic environment in Russia at the time.

      13.    In February, 1994, Merkuriy reaffirmed by letter to Semtek its commitment to establish the joint venture.

      14.    In May, 1994, Sivirin telephoned Semtek's President, Edward Shapiro to tell him that Martin Marietta Corporation (later Lockheed), had expressed an interest in the Loutch.  At first this alarmed us, but upon reflection, we believed that company could enhance the success of the venture.  We sought more info from Sivirin and invited him to the U.S. in order to have a joint meeting with Martin Marietta.  He agreed.

      15.    On June 20, 1994 Sivirin reaffirmed in writing our previous agreements.  On July 1, 1994, I participated in a conference call between Semtek and Sivirin.  Sivirin told us that the Merkuriy/Semtek venture was still valid though he also added that Merkuriy had entered into some kind of "pro forma contract" with Martin Marietta.

      16.    Shortly thereafter, Sivirin sent Semtek a fax delaying his trip the U.S.  We at Semtek were now clearly alarmed.  On July 6, 1994, Semtek sent a letter to the CEO of Martin Marietta.  Semtek inquired as to whether any reported agreement between Martin Marietta and Merkuriy might conflict with the existing agreement between Semtek and Merkuriy.

      17.    Martin Marietta responded by directing us to contact Mr. Sam Ursini, their

Director of Business Development. On July 10, 1994 Semtek also received a phone call from Mr.

Richard Millman of Transworld Communications (TWC), informing Semtek that TWC also had

a contract with Merkuriy and it was for the exclusive rights to the Loutch satellite.

18.     In a series of subsequent meetings in Washington D.C. which I attended, Semtek

was informed by Mr. Ursini that contrary to Mr. Sivirin's statement, Martin Marietta had no

contract with Merkuriy, but rather had a contract with TWC.  Mr. Millman, who had a reputation

as a difficult man, threatened to sue us in our corporate and individual capacities.

19.     Following these meetings, Semtek attempted unsuccessfully to revive the

relationship with Merkuriy.

20.     On July 27, 1994, in an abrupt turnaround and quite to our surprise, Semtek

received a fax from Mr. Sivirin denying that any agreement existed between Semtek and

Merkuriy and insisting that Semtek discontinue claiming that one existed.

21.     Semtek continued making attempts to resolve our differences up to the end of

1994, but to no avail.

22.     Up to this point Semtek was aware of a relationship between Merkuriy and NPO

PM.  We knew that NPO PM was the manufacturer of Russian satellites including the Loutch.

We also knew that Sivirin wore two hats, working as an officer for both companies.  We

understood NPO PM supported and approved the Merkuriy-Semtek deal.  He had twice written

under the guise of NPO PM authorizing Semtek to search for customers for the use of another set

of satellite transponders, the Gorizont.  But we did not become aware until much later, during the

Lockheed litigation, of the extent of control NPO PM had over not only Merkuriy but the

commercialization of the Loutch satellites themselves.

23.     By this time, the Semtek partners decided to take legal action.  On August 15, 1995, Semtek filed a civil complaint against Merkuriy and Sivirin for breach of contract, fraud and other causes of action.

24.     Without going into detail concerning every filing in the case, suffice to say that from our side, it was a long and at times very frustrating experience.

25.     On April 24, 1996, the Court entered a judgment in our favor against Merkuriy and Sivirin.  The Court also enjoined Merkuriy from entering into or carrying out any agreement with TWC or Lockheed (the successor to Martin Marietta) that would thwart the Semtek-Merkuriy agreement.  The case was closed and we thought we had won.

26.     One month later Merkuriy and Sivirin appeared, filing a motion for relief from judgment.  On August 13, 1996, the motion was granted, and the case was reopened.

27.     Over a year was spent in a fruitless effort to serve the defendants via Letters Rogatory, this despite the defendants having already appeared.  Eventually the Court allowed us to serve them via registered mail, which we did.

28.     Once again Merkuriy/Sivirin failed to answer, and the Court issued a Notice of Default and we filed our intention to seek a renewed Judgment.  On May 11, 1998, Merkuriy/Sivirin filed a motion to vacate the notice of default and to dismiss.  Their motion was denied by the Court, and once again we thought we had won.

29.     However, after another motion by the defendants in which they pledged to defend the case on the merits rather than on lack of service, the Court vacated the Notice of Default.  On July 21, 1998, Merkury/Sivirin answered our complaint.

30.     More than a year of discovery disputes ensued in which eventually the Defendants were compelled to produce documents, following which, several months were taken up when the Defendant's counsel moved to withdraw.  The withdrawal motion was eventually granted in January 2000.

31.     On January 26, 2000, the Court set a hearing for April 12, 2000 threatening a default judgment should the Defendant's fail to appear.  Merkuriy/Sivirin again failed to appear and the judgment was again entered and the case closed.

32.     A separate lawsuit was initiated against Lockheed in 1997 for inducing a breach of contract, intentional and negligent interference and other causes of action.

33.     In California, the suit was dismissed under the two-year statute of limitations. The case was then brought in Baltimore, Maryland, Lockheed's headquarters.  Lockheed argued and initially won based on the argument that the California dismissal was res judicata under Rule 41(b) of the Federal Rules of Civil Procedure. The Court of Special Appeals affirmed the dismissal. The Maryland Court of Appeals denied review.  However, the U.S. Supreme Court unanimously reversed the Court of Special Appeals' affirmance and the matter was remanded to the Circuit Court in late summer 2001.

34.     On two successive occasions, the Maryland Court of Special Appeals unanimously upheld the decision of the lower court and thereafter, the Maryland Court of Appeals in 2008, denied review for the last time.

35.     Thereafter, following discovery, motion practice and an eleven-day trial in late 2003, Lockheed received a ruling in their favor from the Court finding that Lockheed was not

aware of Semtek's relationship with Merkuriy.  I was extensively involved in the Lockheed litigation.

36.     It was during the course of the Lockheed litigation that documents surfaced via discovery which in part clarified the role that NPO PM had been playing behind the scenes throughout the time of the Semtek-Mercury agreement.  Various documents and testimony demonstrated that NPO PM continued to direct and control the efforts to commercialize the Loutch satellites after Merkuriy's breach of the Semtek agreement. For example, in December 1994, Mikhail Reshetnev as Chairman of NPO PM contacted Martin Marietta (Lockheed) directly to develop the Loutch network, effectively by-passing both Semtek and Transworld.

37.     It had been my understanding, based on my involvement with Merkuriy and Sivirin, that Merkuriy, and its legal successor, Mercury Telesat, had no substantive assets other than the access NPO PM provided to its satellite systems and the right (through NPO PM approved licenses) to market excess communication capacity on those satellites for commercial purposes.  Based on my involvement with the Lockheed and Transworld litigation, I understand this remained the case even after the Semtek-Merkuriy deal fell apart.  Merkuriy didn't even have a fax machine, using NPO PM's throughout the whole existence of Merkuriy and Mercury Telesat.

38.     I am aware that Merkuriy changed its name in December, 1998 to Mercury-Telesat, which expressly claimed to be the legal successor to Merkuriy.  Nonetheless, in documents produced in connection with the Lockheed litigation which I reviewed, NPO PM continued to use the name Merkuriy in its own documents and the corporate names Merkuriy and Mercury-Telesat appeared to be inter-changeable.

39.     Merkuriy and Mercury Telesat marketed access to the Loutch satellites on behalf

8

of NPO PM and the Russian military. The intended customers were foreign companies, largely media-related.

40.    I am aware as a result of the Lockheed litigation that NPO PM continued to attempt to commercialize the Loutch satellites during the Semtek Merkuriy litigation. For example, in November 1998, NPO PM signed a contract with TWC to produce a study on the commercialization of the Loutch 3 satellite. Neither Merkuriy nor Mercury-Telesat is mentioned in the contract or any work orders or amendments to the contract. Nevertheless, when NPO PM invoiced TWC for work done by NPO PM, NPO PM instructed TWC to make the bulk of the payments to Merkuriy Ltd's bank account.

41.    In hindsight and with the benefit of my experience in the Lockheed litigation it has become clear to me that NPO PM always had substantial control over the marketing of the Loutch satellites. At times NPO PM would use front companies, Merkuriy Ltd or Mercury Telesat, but all substantive decisions and control over the commercial access to the satellites remained in the hands of NPO PM.

42.    I am also aware that after the in-flight failure of a Loutch-2 satellite, the Transworld-NPO PM efforts to commercialize the Loutch satellites stalled in late 1999-2000.

43.    Following the final judgment against Merkuriy and Sivirin on April 12, 2000, the focus of Semtek's efforts went into the Lockheed litigation. At that time, it also appeared as if NPO PM had lost interest in further efforts to commercialize the Loutch satellites. Semtek contacted attorneys and investigators in Russia as part of an effort to evaluate executing on the judgment in Russia, but we were told it was not feasible under the circumstances, especially given Merkuriy's minimal assets. This confirmed that Merkuriy's primary asset was its access to NPO PM's Loutch satellites and the right to market their excess communications capacity. I am

9

not aware of any evidence that Merkuriy continued to do business, but am aware that Pyotyr Sivirin continued to work for NPO and later ISS.

44.     Subsequently, we began renewed efforts to get justice and resolve Semtek's longstanding claims against Merkuriy and Sivirin with Russian authorities.

45.     With the assistance of a Washington D.C government consulting firm, including a former Congressman, we first sought the advice and assistance of the U.S. State Department.

46.     Thereafter, on several occasions, Semtek's attorneys and our consultants corresponded and met with representatives of the Russian Federation at the Embassy in Washington, D.C. in an effort to open a dialogue concerning the Merkuriy judgment and NPO PM's potential exposure for that liability.  Our attorneys also attempted to contact NPO PM directly.  Our efforts were not successful.

47.     In 2008, the transformation of NPO PM to ISS became effective.  At this time, development and commercialization of the Loutch became an important part of the NPO PM-ISS marketing strategy.  Thereafter, Semtek initiated this lawsuit.

48.     Based on the information I have reviewed, including the ISS website and other information, ISS now owns and controls the very same assets and business opportunity that was at the heart of the Semtek Merkuriy deal.  ISS appears to be a mere continuation of the Merkuriy/NPO PM satellite business.

49.     Despite ISS's denials, NPO PM continued to have a legal and financial relationship with Merkuriy through the 1990's.

50.     As a result of the breach and defendants failure to pay the judgment, Semtek suffered significant financial losses and our business operations were effectively destroyed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _25_ day of August, 2010, at _Santa Barbara_ , California.

_[signature]_

PIERRE J. QUINTANA

STATE OF CALIFORNIA            )
                               ) ss.:
COUNTY OF _Santa Barbara_      )

I HEREBY CERTIFY that on this _25_ day of August, 2010, before me, an officer duly authorized in the State of California and in the County of _Santa Barbara_ , to take acknowledgment, personally appeared PIERRE J. QUINTANA, who is personally known to me or who has produced _Drivers License_ as identification.

_[signature]_

Notary Public

> MAURICE JANCO
> Commission # 1822343
> Notary Public - California
> Santa Barbara County
> My Comm. Expires Nov 29, 2012

11