EXHIBIT 5


Affidavit of Alexander Makotinski

# IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | |
|---|---|
| SEMTEK INTERNATIONAL CORPORATION, successor by merger to SEMTEK INTERNATIONAL INCORPORATED,<br><br>Plaintiff,<br><br>vs.<br><br>LOCKHEED MARTIN CORPORATION, successor by merger to MARTIN MARIETTA CORPORATION and MARTIN MARIETTA TECHNOLOGIES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 97183023/CC 3762 |

## AFFIDAVIT OF ALEXANDER MAKOTINSKI

I, ALEXANDER MAKOTINSKI, declare:

1.    I speak, read and write English fluently. I make this declaration in English.

2.    Since approximately 1990, I served as deputy director of SmalSat, a private shareholding company established under Russian law and which held the exclusive marketing rights in Russia and the CIS with respect to certain geosynchronous satellites commonly known as Loutch (sometimes Luch). The Luch satellites were manufactured by a Russian state-owned entity called NPO-PM, which satellites were primarily dedicated to communicating with the Russian space station, Mir, and for various military communications. SmalSat served as the marketing arm for NPO-PM in Russia and the CIS. Initially, SmalSat had three shareholders: NPO-PM, another state-owned manufacturer, and Soyuzmedinform, a healthcare information disseminating body of the government headed by Prof. Kiselev. The principal product line SmalSat represented were low earth orbiting satellites (LEOS).

3.    I was educated at the University of Moscow where I studied linguistics, majoring in English with course work in French and Spanish. After I received my degree in 1986, and after spending a short stint with an official Russian news agency, I was employed as a staff member by Physicians for the Prevention of Nuclear War, an international organization founded by Dr. Bernard Lown of the Harvard Medical School. In or about 1988, I left that organization to become head of telecommunications for Soyuzmedinform, which was the National Institute for Medical Information under the Ministry of Health in the Soviet Union, Headed by Dr. Kiselev, Soyuzmedinform used

1

satellite telecommunications to exchange medical information and provide continuing
medical education across the former Soviet Union.

     4.     In 1991 I joined SmalSat which, as noted above, was established as a
private shareholding company by Soyuzmedinform among others. For a time SmalSat
shared offices with Soyuzmedinform and I and others split our time between SmalSat and
Soyuzmedinform. I was the deputy director for SmalSat in charge of business
development and marketing.

     5.     SmalSat's primary function was to develop through construction and
launching a constellation of LEOS satellites called Gonets. SmalSat was also involved in
several projects for the commercialization of existing satellite capacities on various
Russian satellite systems, i.e., making commercial use of satellite transponder time on
satellites owned by, and primarily serving, governmental interests.

     6.     Also affiliated with NPO-PM, the Russian state-owned manufacturer of the
Luch satellites, was another private shareholding company, Merkuriy, Ltd. (sometimes
spelled Mercury). Merkuriy was licensed by (a) the Russian Space Agency (the Russian
equivalent of NASA), (b) the division of the Russian military roughly translated as the
Military Space Forces, and (c) the Ministry of Communications (the Russian equivalent
of a PT&T – Post Telephone & Telegraph or, in the U.S., the Federal Communications
Commission) to make commercial use of certain capacities on the Luch (also spelled
Loutch or Louch) satellites, e.g., excess transponder time. The telemetry, tracking and
control (TT&C) for all these satellites was handled by the Russian military. Merkuriy's

2

initial shareholders included NPO-PM and RNII KP, a state-owned industrial entity which developed and contributed the communications package for all the Luch satellites.

7.     NPO-PM, the state-owned manufacturer of the Luch satellites, should not be confused with Shareholding Company NPO-PM (sometimes translated as "Stock Company NPO-PM") which was a private shareholding company formed by NPO-PM for some possible commercial work. Shareholding Company NPO-PM owned no assets and held no rights with respect to the Luch satellites.

8.     Academician Mihail Reshetnev was, until his death in 1996, the Chairman of the Board of Merkuriy. He also served as head of NPO-PM, the state- owned manufacturer of the Luch satellites. He may have been the chairman of the board of Shareholding Company NPO-PM as well.

9.     At all times since 1991, Pyotr Sivirin served as Executive Director of Merkuriy. He also held the title of Deputy Director at NPO-PM, the state-owned manufacturer of the Luch satellites. At no time in the 1990's did Mr. Sivirin's official monthly salary exceed $1000 as Executive Director of Merkuriy.

10.     I have known Pyotr Sivirin since 1991 when he was acting as Executive Director of Merkuriy. Mr. Sivirin neither speaks nor writes in English. Nor can he read English. I have worked alongside Mr. Sivirin for some years and have seen his signature many times. I can recognize his signature. On occasion I would translate English documents for Mr. Sivirin and his staff.

11.     Mr. Sivirin was the top executive figure at Merkuriy and was charged with administering the affairs of Merkuriy on a day to day basis. He negotiated multi-million dollar contracts on behalf of Merkuriy and often signed agreements on behalf of Merkuriy.

12.     In or about late July 1992, I assisted Merkuriy in negotiating one or possibly two agreements with Richard Millman, the president of Transworld Communications (USA), Inc. (hereinafter "Transworld") whereby Transworld was given possession of an earth station owned by Merkuriy in the U.S. and was allowed experimental use of excess transponder time on a Luch geosynchronous satellite then in orbit at 16 degrees west (16W) (hereinafter Cosmos 2054, the name under which it was registered with ITU, the International Telecommunications Union). Its primary mission was to provide communication with the space station Mir. SmalSat was engaged to facilitate Transworld's efforts to test Cosmos 2054. The agreement(s) did not afford Transworld the right to commercialize the excess capacity of Cosmos 2054 because no agreement had been reached on pricing. The agreement(s) contemplated that the parties would attempt to negotiate an agreement for such commercial use. The 1992 agreement(s) did not afford Transworld the exclusive rights to commercialize Cosmos 2054 or any satellite owned by the Russian government. Because Smalsat was charged with facilitating Transworld's testing, I had frequent contact with Mr. Millman and Transworld from late 1993 until mid-1994 when SmalSat ceased providing any support to

4

Transworld due to its repeated failures to pay monies due to SmalSat for services rendered.

13.     Merkuriy and Smalsat were unhappy with Transworld's performance almost from the beginning because Transworld failed to pay for a new mobile ground station which had been put at Transworld's disposal at the Washington International Teleport near Washington DC to communicate with Cosmos 2054 where Transworld was located. I know this because Transworld was also delinquent in its payments to SmalSat and because Mr. Sivirin spoke to Transworld about this problem many times.

14.     NPO-PM had been planning to design and construct a new series of Luch satellites (the New Generation Luch Satellites or Luch 2) to serve the Russian military's needs for communications. In fact two such new satellites had been constructed by 1993 and were on the ground. Alexander Averianov, who assisted me at SmalSat, although he was on the payroll of Merkuriy, came up with the idea that the redundant transponders on the New Generation Luch Satellites could be dedicated entirely to commercial purposes and therefore the satellites should not be launched until those redundant transponders could be adapted or modified for commercial purposes. Hence, it was contemplated that, in addition to two transponders which would be dedicated to military communication needs and thus be preemptible if their excess capacity was used commercially, the New Generation Luch Satellites would have two additional transponders which could be used 100% for commercial purposes and could be modified to facilitate their commercial use.

15.     Accordingly, Merkuriy was actively seeking a western joint venturer or joint venturers to exploit the commercial opportunities presented by the New Generation Luch Satellites. This was the prototypical and standard way the Russian government insisted on doing business with Western companies to insure joint control and to prevent being taken advantage of by more commercially sophisticated Western companies.

16.     Mr. Millman and Transworld expressed interest in securing the exclusive rights to enter into a joint venture to exploit the commercial opportunities presented by the New Generation Luch Satellites. Merkuriy was not interested in such an arrangement unless some other more reliable Western company was involved. Beginning in early 1993, Mr. Millman claimed that Transworld could bring Martin Marietta into the arrangement and that Martin Marietta had new technology to offer which would allow data compression for satellite communications.

17.     Having assisted Merkuriy in negotiating a written agreement with Transworld called the Loutch Satellite Agreement which concerned the commercialization of the excess capacity of Cosmos 2054 and other Luch satellites of that generation (Luch 1), I attended a meeting at Smalsat's Moscow offices on or about April 16, 1993. LMC Ex. 16. Also present at that meeting were Mr. Millman, Transworld's counsel, Kenneth Hautman, Mr. Nidal, a representative of an Arab investment group, Dr. Reshetnev and Mr. Averianov. Mr. Sivirin was not present. The Luch Satellite Agreement was executed by both Transworld and Merkuriy that day in my presence. At the same time Transworld's counsel, Kenneth Hautman, had drafted another

written document in English regarding the commercialization of the New Generation
Luch Satellites which document was sometimes referred as the Umbrella Agreement.
The signatories on the so-called Umbrella Agreement were to have been Transworld and
Shareholding Company NPO-PM. In retrospect, it is curious that the Russian entity
involved would be Shareholding Company NPO-PM because it had no assets or rights in
any of the satellites. It was Merkuriy which held the license for commercial usage of
certain capacities on the satellites. The so-called Umbrella Agreement acknowledged as
much because it did not represent that Shareholding Company NPO-PM held any real
rights to any part of the Satellites' capacities but instead represented that Shareholding
Company NPO-PM had "access" to the satellites. When the so-called Umbrella
Agreement was presented to Mr. Reshetnev, he refused to sign it because Transworld was
not considered a reliable partner. Instead after some discussion with Mr. Millman, Mr.
Reshetnev offered to initial it below the signature block to indicate that the agreement
would be acceptable when and if Transworld brought a more reliable Western partner into
the transaction, e.g. Martin Marietta. Mr. Reshetnev then placed his initials below the
signature line. Mr. Millman did the same. A copy of that agreement so initialed is
Exhibit 15, LM013883-013886 and 013888. We on the Russian side of the discussions
did not consider the so-called Umbrella Agreement to be a meaningful agreement but
instead merely something Transworld could use to help it secure the financing and
investors it lacked. Hence we did not pay a lot of attention to it.

7

18.     Thus the so-called Umbrella Agreement was not signed on April 16, 1993. In fact it was not signed by Mr. Reshetnev until late in the fall of 1993 when it became evident that Martin Marietta was prepared to commit its involvement in the project of commercializing the New Generation Luch Satellites. Thus even assuming the so-called Umbrella Agreement could afford Transworld some claim to the New Generation Luch Satellites, it most definitely was not the case that Transworld had any rights – exclusive or otherwise – to the New Generation Luch satellites in February 1993 or any time thereafter until sometime after the Luch Term Sheet was signed in November 1993. In retrospect, the so-called Umbrella Agreement's "effective date" – April 16, 1993 – appeared to be a ploy by Transworld to make a claim to priority respecting the New Generation Luch Satellites.

19.     Because Smalsat was involved in providing services regarding Transworld's efforts to commercialize Cosmos 2054, I became aware of Transworld's efforts to obtain rights to the New Generation Luch Satellites. However, Smalsat and I were not privy to Merkuriy's and Sivirin's efforts to locate other Western companies to commercialize the New Generation Luch Satellites. I did become aware sometime in the summer or early fall of 1993 that Mr. Sivirin was negotiating with an American group led by a former Russian academic, Dr. Edward Shapiro, and also with the large Japanese company, NEC, as well as an Argentine company. However at that time I was not aware of the details of the negotiations because there was no contemplated role for Smalsat in

8

those arrangements. At that time I was unaware that Dr. Shapiro's company was called Semtek.

20.     In October 1993, on behalf of Smalsat I travelled to Washington, D.C. for meetings with Transworld and Martin Marietta. Martin Marietta expressed interest in the commercialization of the New Generation Luch Satellites but had not yet committed. Among those present at those meetings were Samuel Ursini of Martin Marietta and Mr. Millman. Because Smalsat was interested in having a reliable Western company involved with technological abilities and funding, I disclosed to Mr. Ursini (with Mr. Millman's advance permission) that there were other companies negotiating for the same rights and that those included Dr. Shapiro's company and an Argentinian concern. I had already mentioned this to Mr. Millman some days or weeks earlier.

21.     By October 1993, Transworld owed Smalsat as much as $260,000 with respect to the Loutch Satellite Agreement, i.e., with respect to Cosmos 2054. This we understood to be of no concern to Martin Marietta since Martin Marietta had told us that it had no interest in Cosmos 2054 or the Loutch Satellite Agreement. Nonetheless, Mr. Millman strongly suggested to me and others at Smalsat that we ask Mr. Ursini to have Martin Marietta advance the $260,000 needed to bring Transworld current on its obligations regarding Cosmos 2054 lest some competing interest obtain the rights to Cosmos 2054. Later that fall we learned that Martin Marietta did advance $260,000 to Transworld but Mr. Millman only paid about half that sum to Smalsat/Merkuriy.

22.     On or about November 11, 1993, a document entitled Loutch Term Sheet was negotiated and drafted to memorialize a non-binding agreement in principle reached

9

between Transworld and Merkuriy regarding the New Generation Luch Satellites. A copy of the Loutch II Term Sheet is Exhibit 101. (The so-called Umbrella Agreement was actually signed by Reshetnev at the same time as the Loutch Term Sheet was signed or shortly thereafter.) The very last section of the Loutch Term Sheet (Section 7) states: "This arrangement is subject to confirmation in definitive agreements between Transworld and Mercury (modification and launch of satellites), the designee and assignee of NPO-PM, and between Transworld and SmalSat (initial marketing and obtaining all necessary licenses and approvals) to be completed by December 31, 1993 with execution of the agreements by January 3, 1994. There is no binding agreement between the parties until the above condition has been satisfied." This provision was discussed at some length by the Merkuriy and Transworld representatives and it was clear that the Loutch Term Sheet was non-binding and that all agreed that any previous agreement or discussions regarding the New Generation Luch Satellites were non-binding. In my experience in negotiating agreements on behalf of Russian companies, language like that in the last paragraph of the Loutch Term Sheet was typically employed when the parties did not want their agreement to be viewed as binding. Absent such language, it is my understanding that an agreement would be considered binding.

23.     Finally, only in December 1993, I witnessed Transworld and Merkuriy enter into a binding agreement regarding the New Generation Luch Satellites under a written agreement entitled Implementation Agreement No. 1. On the same date, Transworld and Smalsat entered into a written agreement entitled Implementation

10

Agreement No. 3 by which Smalsat was made the exclusive marketing agent for the
proposed Russian satellite telephony system Transworld and Martin Marietta were
planning to create with the New Generation Luch Satellites. It had also been
contemplated that Transworld and Shareholding Company NPO-PM also enter into a
fully drafted written agreement entitled Implementation Agreement No. 2 whereby
provision was made for the sharing of revenues from the proposed Russian satellite
telephony system with that Russian entity. However, Implementation Agreement No. 2
was never executed. (All of the Implementation Agreements were drafted by Mr.
Hautman, counsel for Transworld, and referred back to the so-called Umbrella Agreement
which each Implementation Agreement purportedly served to implement. The entire
structure or architecture of these agreements – the so called Umbrella Agreement and the
Implementation Agreements – was Mr. Millman's and his counsel's idea and we on the
Russian side really didn't pay attention to it.)

24.    Either on the day before Implementation Agreements Nos. 1 and 3 were
signed or on the same day just before the signing, I overheard Mr. Ursini and Mr.
Millman in a heated discussion about the U. S. International Chamber of Commerce's
"black-listing" of Transworld for its past conduct.

25.    Mr. Millman had told us from the beginning that he was a lawyer although
he no longer practiced law. At no time did Transworld or Martin Marietta ever inform us
that Mr. Millman had been suspended from the practice of law for misconduct in a federal
court in the United States and we on the Russian side were ignorant of that fact.

26.     To use the New Generation Luch Satellites further licenses had to be obtained from the Ministry of Communications (the equivalent in Russia of a PTT license) and yet another from the Frequency Allocation Committee. The carrier license and other regulatory approvals pertaining to the commercial use of the New Generation Luch Satellites were obtained by Transworld after mid-1994 when Smalsat ceased any further activities with respect to the marketing of the New Generation Luch Satellites.

27.     The first of the two New Generation Luch Satellites was to be launched to 77E and the second would be later launched to 16W. However this second satellite to be launched to 16W was not to be a replacement for Cosmos 2054 but instead to operate simultaneously at that slot for other purposes.

28.     In early 1994, Mr. Millman and certain Martin Marietta staff came to Russia for a series of meetings. Mr. Millman brought along Robert Kremer whom he introduced as someone he had met on the plane who was a good man with many connections. We at Smalsat were surprised because there was no need for making connections in Russia since Smalsat and Merkuriy had all the connections needed to make the venture work. Thereafter until Smalsat ceased providing any further services to Transworld at the end of the summer 1994, I observed Mr. Kremer acting as a Transworld representative. On later occasions I warned Mr. Kremer that he might find himself where Smalsat was – unpaid by Mr. Millman and Transworld.

29.     When Transworld arranged for a sale of excess transponder time on Cosmos 2054 to the American cable news company, CNN, to transmit footage of the

12

historic South African elections which were to take place in the spring of 1994, Smalsat became responsible for putting together the technical and operational team in Moscow, South Africa and Atlanta, Georgia, CNN's home office, to accomplish the transmissions. Transworld obtained the necessary waivers and licenses to transmit from South Africa to Cosmos 2054 which would then transmit the signal to Moscow and then from Moscow back to Cosmos 2054 for transmission to the earth station licensed to Transworld in Washington, D.C. Despite a few technical failures which had to be expected on such a pioneering effort put together on such short notice, Smalsat succeeded in actually transmitting video footage of that election for CNN's usage under its arrangements with Transworld. Apparently CNN complained that Transworld had never told CNN that the transmissions could be interrupted by the Russian military and the occasional preemptions surprised and frustrated CNN. To my knowledge this was the first successful commercial use of some magnitude by a western company with respect to a Luch satellite.

30.     Other successful commercial trans-Atlantic transmissions arranged by Transworld were made via Cosmos 2054 to transmit the Clinton/Yeltsin summit in January 1994 and December 1993 Chanukah celebrations in Moscow.

31.     Because Transworld was very delinquent on its payment obligations with respect to Cosmos 2054, Merkuriy declared Transworld in default of those obligations and terminated the Luch Satellite Agreement in April 1994. There was some discussion about reinstating Transworld under that agreement during the summer of 1994 but

13

Transworld's non-performance continued with respect to not only its obligations regarding the Cosmos 2054 but also its obligations under Implementation Agreement No. 1. Hence, on or about September 9, 1994, Mr. Reshetnev gave written notice to Transworld that it was in default under both those agreements as well as the so-called Umbrella Agreement and that all of Transworld's rights under those agreements were terminated.

32.    In July 1994, I travelled to San Diego to meet with Mr. Ursini and his boss, Robert Whalen, of Martin Marietta. I was appealing to Martin Marietta to take steps to cause Transworld to pay Smalsat the sums due it. In the course of that conversation, they told me that they and others in Martin Marietta's San Diego's offices wanted to get rid of Mr. Millman and Transworld but that they were unable to do so because Mr. Millman had the support of John Montague and others in the corporate headquarter offices of Martin Marietta in Bethesda, Maryland.

33.    One of the reasons why Merkuriy became frustrated with Transworld, besides its failure to meet its monetary obligations, was that it refused to negotiate a joint venture agreement with Merkuriy. The so-called Umbrella Agreement had contemplated a joint venture with Transworld taking 80% of the net revenues and Shareholding Company NPO-PM 20% of the net revenues. Implementation Agreement No. 2 was drafted to accomplish this but it was never signed. Hence Merkuriy was unhappy with Transworld and considered the state of the documentation to have resulted in an unconscionable agreement whereby Merkuriy got paid only to modify the antennae on the

14

New Generation Luch Satellites and had no written assurance it would receive any part of the revenues from the commercial uses of the satellites. In fact this was the position Merkuriy took in the Stockholm Arbitration with Transworld some years later.

34.     Besides Transworld's failure to meet its payment obligations, Smalsat also found Transworld inadequate to the tasks because during the time Smalsat dealt with Transworld (later 1992 to summer 1994) Transworld lacked the in-house technical personnel to meet its obligations. For only a period of the time, Transworld had only one person on staff who was an experienced engineering professional. That was Paul Palmiter, who resigned from Transworld in ___. Mr. Millman and the others at Transworld at the time, including Mr. St. Germain, lacked any technical expertise.

35.     In the late summer of 1994, Mr. Sivirin made several trips to the U.S. alone reportedly to meet with Transworld. We were told he was also flown to the Carribean at Transworld's expense. I and others at Transworld as well as Dr. Reshetnev, advised Mr. Sivirin that he should not travel without a translator to meet with Mr. Millman or Mr. Kremer. It was discussed among Smalsat personnel that Mr. Sivirin appeared to be acting under the control of Transworld at that time. We had observed correspondence signed by Mr. Sivirin which was inconsistent with Dr. Reshetnev's positions and which most definitely had not been prepared by Mr. Sivirin.

36.     I understand that Lockheed Martin is contending that the Luch satellites were inadequate for the purposes Semtek wanted to employ them for, initially trans-Atlantic transmissions. I have read those pages of the report Dr. James Stuart prepared

15

for Semtek which relate to the Luch satellites' strengths and weaknesses (Exhibit 65, pp. 25-40.) Dr. Stuart's report is accurate respecting the Luch satellite capabilities. I agree with him that tracking systems on the ground were readily available to compensate for the apparent wobble due to inclination. Also, any concern about obtaining waivers in countries other than Russia for off-set or non-standard frequencies is limited to the two unmodified transponders on any New Generation Luch Satellite because the two redundant transponders on any New Generation Luch Satellite were to be dedicated to 100% commercial use and therefore could have their frequencies changed to standard frequencies before they were launched. Martin Marietta and Transworld chose not to do so in connection with the proposed Russian telephony system because the frequencies were not off-set or non-standard in Russia and because those frequencies were less likely to be interfered with for Transworld's and Martin Marietta's purposes.

37.     Even the preemptible transponders which used off-set or non-standard frequencies such as the Cosmos 2054 were still marketable in the West. In fact, in 1995 after Merkuriy had terminated any rights Transworld had to Cosmos 2054, Smalsat was contacted by CNN which remained interested in using Cosmos 2054 for satellite transmissions. Several transmissions from Russia to CNN in the U.S. were accomplished on the Cosmos 2054 but CNN ceased using that satellite when Transworld threatened to sue CNN for violating Transworld's claimed rights to Cosmos 2054.

16

38.     I understand that Lockheed contends Semtek has paid me for my cooperation and testimony. This is absolutely false. I have freely agreed to cooperate with Semtek because I have come to believe Semtek has been done an injustice. Semtek has compensated me on the two occasions when I have come to the United States to meet with Semtek's principals and lawyers in Los Angeles. Semtek advanced me monies on a per diem basis to compensate me for airfare from Moscow and for lodging and meals. The monies Semtek advanced also compensated me for the time I had to take off from my work. Because of my technical expertise, experience, and language skills, and as a director and principal of Gonets Satcom, I am generously compensated in Russia. Hence it was wholly appropriate that I be reimbursed for all the travel expenses and loss of compensation for the two trips I have made to Los Angeles. I voluntarily appeared for deposition in Los Angeles. I understand that I am the only Russian-based witness to do so. I have also informed Semtek that I will voluntarily appear at trial in September provided only that I am reimbursed for my travel, lodging and meals as well as for any loss of income.

39.     In or about December 1995, Transworld initiated arbitration proceedings against Merkuriy, NPO-PM and Smalsat in Stockholm. Mr. Sivirin was actively involved in those proceedings as was I. The proceedings never went so far as to involve any evidentiary hearings. Instead the claims were ultimately settled sometime in 1997. Mr. Sivirin directed the settlement negotiations for the Russian side and insistent that we

17

agree to the terms ultimately proposed by Transworld. We at Smalsat were disappointed with the settlement because it effectively reinstated Transworld's defaulted contract rights with respect to Cosmos 2054. At no time during the pendency of the arbitration (which finally concluded in May 1998) was I aware that Mr. Sivirin was being paid as a consultant by Transworld. (Interestingly, during the arbitration, Transworld claimed it had suffered over $140 million in damages because it had been allegedly deprived of its rights to exploit Cosmos 2054 and related satellites of that generation. Transworld also claimed that it had obtained FCC license to transmit from Washington to Cosmos 2054 when in the past it had only had permission to receive in Washington DC.)

40.     In or about 1998, Smalsat's role was assumed by a new private entity called Gonets Satcom. I am a 20% shareholder and member of the Board of Gonets Satcom.

41.     I have been shown two short messages marked LMC Exhibits 19 and 47 which purport to confirm a joint venture undertaking between Merkuriy and Semtek. While I never saw these documents until recently, I recognize the signature as Mr. Sivirin's.

42.     I have been shown a letter signed by Mr. Sivirin and addressed to Mr. to Mr. Newkirk dated July 27, 1994 (Exhibit 53) does not employ terminology Mr. Sivirin would use.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true and correct.

Executed this _11_ day of July, 2003, at ___*10-00 MSC.T*___

_____
Alexander Makotinski