UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SEMTEK INTERNATIONAL INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>ACADEMICIAN M.F. RESHETNEV INFORMATION SATELLITE SYSTEMS,<br><br>Defendant. | C.A. NO. 1:09-CV-10183-RWZ |

**AFFIDAVIT OF PYOTR SIVIRIN**

I, Pyotr Sivirin, hereby depose and say:

1. From March 2008 through the present date, I have been employed as a department head for the development of space systems at Academician M.F. Reshetnev Information Satellite Systems ("ISS"). I have personal knowledge of the following facts and I make this affidavit in support of ISS's motion to vacate default judgment in the captioned lawsuit.

2. Prior to my employment with ISS, I was employed by Academician M.F. Reshetnev Nauchno-Proizvodstvennoe Obiedinenie Prikladnoi Mekhaniki ("NPO PM") from January 1967 to December 1991 (as my primary job); October 2000 to October 2002 (as a secondary job); and October 2002 to March 2008 (as my primary job). I also served as the Executive Director of Merkuriy Ltd. and Merkuriy Telestat ("Merkuriy") from September 1991 to August 2002.

3. ISS shares are wholly-owned by the Russian Federation through its Federal Agency on Management of Federal Property. ISS employs over 6,350 individuals and specializes in the design, development and manufacture of high performance spacecraft and

satellite systems, including mission-critical satellite testing and qualification as well as satellite-in-orbit control and support.

4.     ISS does not own any assets in the United States. ISS's only contacts with the United States are four agreements with American companies for the purchase of goods and licensing of rights. In the first agreement, ISS has contracted to purchase semiconductors and solar sells from a New Jersey corporation with a principal place of business in New Mexico. In the second and third licensing/royalty agreements, ISS has been granted the right to utilize a Proton launcher by a Delaware corporation with a principal place of business in Virginia. In the fourth agreement, ISS has contracted to purchase electric satellite components from a Delaware corporation with a principal place of business in California.

5.     From 1959 until 2008, NPO PM was an enterprise wholly-owned by the Russian state (first, the Soviet Union and later, the Russian Federation). During this time, NPO PM employed as many as 12,000 individuals engaged in the business of developing and manufacturing a broad range of satellites and satellite systems.

6.     On September 4, 1991, Merkuriy was founded as a Russian limited liability company. At all relevant times, Merkuriy employed approximately 12 to 16 individuals engaged in the design and development of ground communications, including ground stations for satellite communications.

7.     NPO PM owned approximately 13.95% of the outstanding participatory shares of Merkuriy upon the founding of the company. At no time did NPO PM execute any agreements on behalf of Merkuriy.

8.  On or around July 1, 1992, a presidential edict forbade national enterprises such as NPO PM from investing in trade companies. NPO therefore was required to divest itself of its shares in Merkuriy.

9.  A united trade union known as Trade Union No. 290 acquired NPO PM's former shares in Merkuriy. Along with Trade Union No. 290's 13.95% interest, the other major shareholders in Merkuriy were a financial investment company known as Fenix-S (approximately 11.63% of outstanding shares), and numerous other individual shareholders including A.P. Pastarnak (approximately 9.30% of outstanding shares), myself (9.02% of outstanding shares), and N.V. Vasilenko (6.98% of outstanding shares). The percentage of outstanding Merkuriy shares owned by the other individual shareholders ranged from approximately 2.33% to 4.65%.

10. On or around January 29, 1999, Merkuriy was reorganized into a limited liability company known as "Merkuriy Telestat" with the same shareholders as Merkuriy. In August 2002, pursuant to the terms of an owners' shares sale contract, all of the shares of Merkuriy Telestat were sold to NEKST Ltd. Merkuriy Telestat was liquidated and excluded from the register of the Companies of the Russian Federation on June 7, 2008. No assets or operations of Merkuriy were transferred or absorbed by NPO PM.

11. On March 3, 2008, NPO PM was reformed under Russian Federation law into the open joint stock company ISS.

12. In the late 1980's and 1990's, the Russian government developed a series of state-owned satellites known as "Loutch" satellites that were intended to facilitate communications with the Soviet/Russian space vehicles Buran, Soyuz and Progress and serve a number of

defense purposes. In all, the Russian government manufactured four Loutch satellites with an expected lifetime of three years each.

13.     The "Loutch-1" satellite was launched into orbit on December 27, 1989, and continued in operation until August 15, 1997. The Loutch satellite No. 11 failed at launch and was burned at the Baikonur launch site. The Loutch satellite No. 12, was launched into orbit on October 10, 1995 and continued in operation until September 1, 1997. The Loutch satellites No. 11 and 12 are sometimes referred to collectively as the "Loutch-2" satellites.

14.     In April 1993, the Russian Ministry of Defense and Russian Space Agency issued a decision granting Merkuriy the non-transferrable right to access the orbiting Loutch-1 satellite and proposed Loutch satellites No. 11 and 12 on a secondary basis for commercial purposes. Primary use of the Loutch-1, Loutch No. 11 and Loutch No. 12 satellites was always reserved for official state use by the Russian Federation. NPO PM was a manufacturer of these satellites, but it was never granted a right to use them commercially.

15.     In the latter part of 1992, I was introduced to the President of Semtek Incorporated, Edward K. Shapiro ("Shapiro"). At the time, I was employed solely as Merkuriy's Executive Director and was so employed at all times relevant to my discussions with Shapiro. Shapiro informed me that he had established a small company for the purpose of engaging in business with Russian Federation private enterprises, and subsequently urged me to meet with him in Moscow to explore potential business relationships between Semtek and Merkuriy.

16.     In late October 1992, Shapiro traveled to Moscow to meet with me for the purpose of discussing a potential joint venture between Semtek and Merkuriy in the fields of satellite communications and the export of Siberian timber. At the conclusion of this meeting, we agreed to meet again within two months to consider the prospect of a joint venture, and on

November 5, 1992 executed a one-half page "Business Agreement" that was "valid during the three months from the date of signing unless it will be replaced by a different, more detailed document."

17. In mid-December 1992, Shapiro and I conducted a series of meetings in Moscow that we summarized in a 7-page "Protocol" signed on December 18, 1992 to spell out the principal features of any future joint venture that might be formed by Semtek and Merkuriy. As contemplated in our Protocol, Merkuriy's contribution to the proposed joint venture would have been to provide capacity on the existing Loutch-1 satellite and Semtek's contribution would have consisted of providing financing and marketing for the venture. The Protocol also stated explicitly that Semtek and Merkuriy "agreed to conclude the final joint venture agreement after a business plan of the joint venture has been approved" and "agree to proceed towards a final written agreement that will encompass all of the above understanding and any others that may be decided between them."

18. During the course of my joint venture discussions with Shapiro, he informed me that Semtek would be required to obtain a license from the United States Federal Communications Commission in order to conduct some of the activities contemplated by the putative joint venture. According to Shapiro, because the joint venture was only in the discussion stage, the FCC would not consider such an application unless Semtek could prove that it was somehow authorized to act on behalf of Merkuriy. To address this issue, on February 8, 1993, I faxed a letter to Semtek at Shapiro's request stating that "MERKURIY LTD has authorized SEMTEK . . . to act as its agents in marketing communication channels of the LUCH satellite," and that the letter was intended to "be used to support SEMTEK [sic] application to the [FCC] to be licensed for employing the LUCH satellite . . . "

19. In the latter part of April 1993, I again met with Shapiro in Montreal, Canada to discuss further the proposed joint venture. The results of our meeting were summarized in a May 2, 1993 Letter of Intent (the "Letter of Intent") which described the proposed joint venture as designed to market, sell and lease communication services on a Loutch satellite scheduled to be launched in 1993. The Letter of Intent further specified that "[i]t is the intent of both MERKURIY and SEMTEK that a Joint Venture Agreement will be negotiated in good faith and signed by both parties on or before July 4, 1993."

20. The final Joint Venture Agreement contemplated by the Letter of Intent was never signed. Because no binding agreement to form a joint venture ever came into effect, Semtek never provided the financial support contemplated by the Letter of Intent. Subsequently, Merkuriy opted to pursue other business opportunities and entered into contracts with Transworld Communications, Inc. to modify the two proposed Loutch-2 satellites.

21. Since the Loutch satellite No. 12 failed on September 1, 1997, there have been no Loutch-category satellites launched into orbit by the Russian Federation. Manufacturing work on the latest generation of Loutch satellites, which are known as the Loutch-5A and 5B satellites, did not resume until 2006 in accordance with the Russian Federal Space Program for the years 2006-2015. The Loutch 5A and 5B satellites, if launched, are ordered by the Russian Federation, intended for exclusive state use by the Russian Federation and have no commercial applications planned.

I declare under penalty of perjury under the laws of the United States pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 31th day of May, 2011.

_____
Pyotr Sivirin

#10370216_v1

В ОКРУЖНОЙ СУД СОЕДИНЕННЫХ ШТАТОВ АМЕРИКИ
ОКРУГ МАССАЧУСЕТС

| | |
|---|---|
| «СЕМТЕК ИНТЕРНЭШНЛ ИНКОРПОРЕЙТЕД», <br><br> Истец, <br><br> против <br><br> «ИНФОРМАЦИОННЫЕ СПУТНИКОВЫЕ СИСТЕМЫ» ИМЕНИ АКАДЕМИКА М.Ф. РЕШЕТНЕВА», <br><br> Ответчик. | Дело № 1:09-CV-10183-RWZ |

## СВИДЕТЕЛЬСКИЕ ПОКАЗАНИЯ ПЕТРА СИВИРИНА

Я, Петр Сивирин, заявляю о следующем:

1. С марта 2008 года по настоящее время я являюсь главой департамента развития космических систем в ОАО «Информационные спутниковые системы» имени академика М.Ф. Решетнёва» («ИСС»). Мне достоверно известны приведенные ниже факты, и я даю данные свидетельские показания в поддержку ходатайства ИСС об отмене судебного решения в пользу истца вследствие неявки ответчика по указному выше делу.

2. До начала работы в ИСС я работал в Научно-производственном объединении прикладной механики имени академика М.Ф. Решетнёва («НПО ПМ»): с января 1967 г. по декабрь 1991 г. (в качестве основного места работы), с октября 2000 г. по октябрь 2002 г. (в качестве работы по совместительству) и с октября 2002 г. по март 2008 г. (в качестве основного места работы). Помимо этого я исполнял обязанности Исполнительного директора компании Меркурий Лтд. и Меркурий Телесат («Меркурий») с сентября 1991 г. по август 2002 г.

1

3. Акции ИСС полностью находятся в собственности Российской Федерации через Федеральное агентство по управлению федеральным имуществом. ИСС имеет в штате более 6 350 сотрудников и специализируется на конструировании, разработке и производстве высокоэффективных космических аппаратов и спутниковых систем, включая критически-важные тестирования и испытания спутников, а также контроль и поддержку спутников на орбите.

4. ИСС не имеет имущества в Соединенных Штатах. Единственными контактами с Соединенными Штатами являются четыре соглашения с американскими компаниями о приобретении товаров и получении прав. В первом случае ИСС заключил контракт на закупку полупроводников и фотоэлементов с корпорацией, зарегистрированной в Нью Джерси, но с основным местом деятельности в Нью Мексико. Согласно второму и третьему лицензионному соглашению и соглашению об уплате лицензионных платежей ИСС получило от компании, зарегистрированной в Делавере, с основным местом деятельности в Вирджинии, право использовать ракету-носитель «Протон». В четвертом случае ИСС заключило контракт на закупку электрических компонентов для спутников с компанией, зарегистрированной в Делавере с основным местом деятельности в Калифорнии.

5. С 1959 г. по 2008 г. НПО ПМ было предприятием, полностью принадлежащим государству (сначала Советским Союзом, позже – Российской Федерацией). В течение этого периода времени на НПО ПМ работало 12 000 работников, занятых в разработке и производстве широкого перечня спутников и спутниковых систем.

6. 4 сентября 1991 г. был учрежден Меркурий в качестве российского общества с ограниченной ответственностью. В период всей своей деятельности Меркурий

имел в штате от 12 до 16 сотрудников, занятых конструированием и разработкой наземных систем связи, включая наземные станции спутниковой связи.

7.      На момент учреждения Меркурия НПО ПМ владело около 13,95% доли в уставном капитале Меркурия. НПО ПМ ни разу не заключало никаких договоров от имени Меркурия.

8.      1 июля 1992 г. указом президента Российской Федерации было запрещено участие государственных предприятий, таких, как НПО ПМ, в торговых компаниях. По этой причине от НПО ПМ потребовали отказаться от своего участия в Меркурии.

9.      Объединенный профсоюз, также известный как Профсоюз № 290, приобрел долю НПО ПМ в Меркурии. Наряду с Профсоюзом № 290, который владел долей в размере 13,95%, другими участниками Меркурия были финансовая инвестиционная компания, известная как Феникс-С (около 11,63% уставного капитала) и многочисленные физические лица, в том числе А.П. Пастарнак (около 9,30%), я (9,02%) и Н.В. Василенко (6,98% уставного капитала). Процент участия в Меркурии других физических лиц варьировался приблизительно от 2, 33% до 4,65%.

10.     29 января 1999 г. Меркурий был преобразован в общество с ограниченной ответственностью, известное как «Меркурий Телестат», с таким же составом участников, как и в Меркурии. В августе 2002 г. по договору продажи долей все доли участников Меркурий Телестат были проданы компании НЕКСТ Лтд. Меркурий Телестат был ликвидирован и исключен из Единого государственного реестра юридических лиц 7 июня 2008 г. Никакое имущество или деятельность Меркурия не были переданы или получены НПО ПМ.

11. 3 марта 2008 г. НПО ПМ был реорганизовано в открытое акционерное общество ИСС в соответствии с законодательством Российской Федерации.

12. В конце 80-х и в 90-ые годы российское правительство разработало серию государственных спутников, известных как «Луч», с целью осуществления связи с советскими/российскими космическими кораблями Буран, Союз и Прогресс, а также для решения ряда оборонных задач. В целом, российское правительство произвело четыре спутника Луч с ожидаемым сроком существования каждого из них в три года.

13. Спутник «Луч-1» был запущен на орбиту 27 декабря 1989 г. и работал до 15 августа 1997 г. Спутник Луч №11 не сработал при запуске и сгорел на космодроме Байконур. Спутник Луч №12 был запущен на орбиту 10 октября 1995 года и работал до 1 сентября 1997 г. Спутники Луч №11 и №12 иногда совместно называют спутниками «Луч-2».

14. В апреле 1993 г. Министерство обороны России и Российское космическое агентство приняли решение о предоставлении Меркурию непередаваемого права доступа к находящемуся на орбите спутнику Луч-1 и предполагаемым спутникам Луч №11 и №12 на вторичной основе в коммерческих целях. Главным назначением спутников Луч-1, Луч №11 и Луч №12 было использование для государственных целей Российской Федерации. НПО ПМ было разработчиком данных спутников, однако ему никогда не предоставлялось право их коммерческого использования.

15. В конце 1992 г. меня познакомили с президентом компании Семтек Инкорпорейтед, Эдвардом К. Шапиро («Шапиро»). В то время я работал исключительно в должности Исполнительного директора Меркурия, и во время всех моих переговоров с Шапиро я являлся исключительно Исполнительным директором Меркурия. Шапиро

4

сообщил мне о том, что он учредил небольшую компанию в целях ведения бизнеса с частными российскими предприятиями и впоследствии предложил мне встретиться с ним в Москве для обсуждения потенциального делового сотрудничества между Семтек и Меркурием.

16. В конце октября 1992 г. Шапиро прибыл в Москву для обсуждения со мной возможности создания совместного предприятия с участием Семтек и Меркурия в сфере спутниковых коммуникаций и экспорта сибирской древесины. По завершении встречи мы договорились встретиться снова в течение двух месяцев для определения перспектив совместного предприятия и 5 ноября 1992 г. заключили полустраничное «Деловое соглашение», которое было «действительно в течение трех месяцев со дня подписания, если оно не будет заменено другим, более подробным документом».

17. В середине декабря 1992 г. Шапиро и я совершили ряд встреч в Москве, итоги которых мы закрепили семистраничным «Протоколом», подписанным 18 декабря 1992 г., который устанавливал основные принципы будущего совместного предприятия, которое может быть создано Семтеком и Меркурием. В соответствии с Протоколом вкладом Меркурия в будущее совместное предприятие должно было быть предоставление емкости существующего спутника Луч-1, а Семтек должен был обеспечивать финансирование и рыночное продвижение предприятия. Протокол также четко предусматривал, что Семтек и Меркурий «заключат окончательное соглашение о создании совместного предприятия после утверждения бизнес-плана совместного предприятия» и «перейдут к подписанию окончательного письменного соглашения, которое закрепит все указанные выше договоренности и любые иные, которые могут быть достигнуты сторонами.»

18. В ходе наших переговоров с Шапиро о совместном предприятии он сообщил мне, что Семтеку потребуется получить лицензию от Федеральной Комиссии Связи Соединенных Штатов Америки в целях осуществления некоторых видов деятельности, предусмотренных будущим совместным предприятием. По словам Шапиро, из-за того, что совместное предприятие было только на стадии обсуждения, Федеральная Комиссия Связи не примет к рассмотрению заявку, если Семтек не докажет, что он каким-то образом уполномочен действовать от имени Меркурия. По этой причине 8 февраля 1993 г. я по просьбе Шапиро направил в Семтек факсом письмо, гласящее о том, что «МЕРКУРИЙ ЛТД. уполномочивает СЕМТЕК ... действовать в качестве своего агента в осуществлении маркетинга каналов связи спутника ЛУЧ», и что целью письма является «поддержка заявки СЕМТЕК в Федеральную Комиссию Связи на получение лицензии на использование спутника ЛУЧ...»

19. В конце апреля 1993 г. я снова встретился с Шапиро в Монреале, Канада для обсуждения дальнейших перспектив предполагаемого совместного предприятия. Итоги нашей встречи зафиксированы в письме о намерениях от 2 мая 1993 г. («Письмо о намерениях»), описывающем планируемое совместное предприятие как создаваемое в целях маркетинга, продажи и сдачи в аренду услуг связи на спутнике Луч, запланированном к запуску в 1993 г. Письмо о намерениях также предусматривало, что «намерением и МЕРКУРИЯ, и СЕМТЕКА является добросовестное согласование и подписание Соглашения о совместном предприятии 4 июля 1993 г. или ранее.»

20. Окончательное Соглашение о совместном предприятии, предусмотренное Письмом о намерениях, никогда не было подписано. Поскольку юридически обязательное соглашение о создании совместного предприятия не вступило в силу, Семтек не

предоставил финансовую поддержку, предусмотренную Письмом о намерениях. Впоследствии Меркурий предпочел выбрать другие деловые возможности и заключил контракты с Трансуорлд Комьюникейшнс, Инк. на модификацию двух запланированных к запуску спутников Луч-2.

21. С тех пор, как спутник Луч №12 прекратил работу 1 сентября 1997 г., больше не существовало спутников типа Луч, запущенных на орбиту Российской Федерацией. Работы по производству последнего поколения спутников Луч, известных как Луч 5А и 5Б, не начинались до 2006 г., когда они возобновились в соответствии с российской федеральной космической программой на 2006-2015 гг. Спутники Луч 5А и 5Б, если они будут запущены, заказаны Российской Федерацией, предназначены для исключительного государственного использования Российской Федерацией и не планируются для коммерческого применения.

Я заявляю под страхом лжесвидетельствования по законам Соединенных Штатов в соответствии с 28 U.S.C. § 1746, что вышеизложенное истинно и верно.

Выполнено сегодня, 31. 05, 2011.

_____
Петр Сивирин

#10370216_v1